# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

### NO. 03-03-00631-CV

**Texas Disposal Systems Landfill, Inc., Appellant**

**v.**

**Waste Management Holdings, Inc. (f/k/a Waste Management, Inc.)
and Waste Management of Texas, Inc., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. 97-12163, HONORABLE PAUL DAVIS, JUDGE PRESIDING**

## O P I N I O N

We grant appellant's and overrule appellees' motions for further rehearing,[1] withdraw

our opinion and judgment issued December 29, 2006, and substitute the following in its place.

Appellant Texas Disposal Systems Landfill, Inc. challenges the take-nothing

judgment entered against it following a jury trial, contending that the trial court committed charge

error regarding issues of defamation per se and presumed damages; that the jury's zero-damages

award was against the great weight and preponderance of the evidence; and that the trial court erred

in dismissing certain claims on summary judgment, including Texas Disposal's causes of action for

---

[1] Appellant's motion requests only that a factual error be corrected, while "reserv[ing] its right to seek a petition for review in the Texas Supreme Court on substantive issues."

defamation, tortious interference, and attempted monopoly/antitrust. Appellee Waste Management[2] argues in a cross point that, as to the defamation claims, even if Texas Disposal's issues are sustained on appeal, the take-nothing judgment should be affirmed based on the lack of evidence of actual malice. We will affirm in part and reverse and remand in part.

## BACKGROUND

Texas Disposal owns and operates a landfill in southeast Travis County ("the Texas Disposal landfill"). Waste Management is one of Texas Disposal's competitors in the waste removal and landfill services industry serving the Austin and San Antonio markets.

In 1995, Texas Disposal and Waste Management competed against one another for a contract to provide waste removal and landfill services to the City of San Antonio. By May 1995, San Antonio and Texas Disposal had begun bona fide negotiations on a contract for Texas Disposal to assume operations of the city's Starcrest Transfer Station, from which Texas Disposal would haul San Antonio's waste to the Texas Disposal landfill, starting in February 1997. San Antonio's city council passed an ordinance in December 1996 authorizing the city manager to negotiate and execute a contract for Texas Disposal to privately operate the Starcrest Transfer Station in accordance with the terms of the proposed agreement between Texas Disposal and San Antonio, which was attached and incorporated into the ordinance. As of the end of January 1997, however, the parties had not yet executed a final contract.

---

[2] We will refer collectively to appellees Waste Management of Texas, Inc. and Waste Management Holdings, Inc. (f/k/a Waste Management, Inc.) as "Waste Management."

2

In November 1996, the City of Austin issued a "request for proposal," seeking bids from companies to provide waste removal and landfill services. Texas Disposal and Waste Management both submitted bids and, as of February 1997, had been selected as the two companies to proceed to Phase II of the bid process for providing the "landfill" and "materials recovery facility and transfer station or landfill" services to the City of Austin.

On January 30, 1997, before either the San Antonio or the Austin contract was finalized, Waste Management caused an "Action Alert" memo to be distributed to environmental and community leaders in Austin, including several members of the Austin City Council. Waste Management hired Don Martin, a consultant, to draft the memo. Martin gathered information from several Waste Management officials, who then approved the memo for publication.[3] Martin sent the memo to an Austin environmental advocate to be "broadcast over his fax network" to the designated group. The topic of the Action Alert was San Antonio's proposal to contract with Texas Disposal to assume operations of the Starcrest Transfer Station. The memo warned readers about the increased traffic and environmental problems that would result, questioned the environmental integrity of the Texas Disposal landfill, and urged recipients of the memo to contact public officials in San Antonio and Austin, as well as the *San Antonio Express News*, to inform them of "your concerns."

---

[3] Waste Management disputes that it gave final approval. Martin initially testified that Loren Alexander of Waste Management reviewed and approved the memo. Two years later, Martin testified that, upon reading Alexander's deposition denying that he approved it, Martin was changing his testimony to agree that Alexander did not give final approval for the memo.

In October 1997, Texas Disposal filed suit against Waste Management,[4] alleging that Waste Management had routinely attempted to disparage Texas Disposal's reputation in an effort to eliminate competition. Based on such conduct, Texas Disposal claimed that Waste Management was liable for defamation, tortious interference with an existing or prospective contract, and business disparagement. The petition discussed the Action Alert memo as a specific example of improper conduct by Waste Management, which, according to Texas Disposal, caused economic damages by delaying the execution of the San Antonio and Austin waste disposal contracts.[5] In addition to compensatory and punitive damages, Texas Disposal sought injunctive relief against Waste Management.

After this initial suit was filed, Waste Management published a series of communications that we will collectively refer to as the "1998 Communications." Waste Management sent a memo to the San Antonio Public Works Department on March 10, 1998, questioning the legality of Texas Disposal operating the Starcrest Transfer Station due to the restrictions in the facility's zoning ordinance and its previously issued permit. Additionally, in May 1998, Waste Management sent an unsigned memo to the San Antonio City Council and the Texas Natural Resource Conservation Commission (TNRCC) urging that the proposed contract with Texas Disposal would result in multiple permit violations. And, on July 14, 1998, Waste Management issued a press release that claimed Texas Disposal had "inspired" a protest demonstration over

_____

[4] Martin was originally named as a defendant, but the claims against him were voluntarily dismissed.

[5] Texas Disposal ultimately finalized its contract with San Antonio in January 1998 and with Austin in May 2000 (following a temporary contract that had been entered into with Austin in February 1999).

Austin's landfill and that urged reasons why Texas Disposal should not be selected in Austin's bid process. Texas Disposal amended its petition on July 25, 2000, to include claims based on the 1998 Communications.

Waste Management denied each of the allegations and asserted, as affirmative defenses, that (1) the alleged statements were true and, thus, not defamatory; (2) the statements were privileged communications made by an interested party in petitioning the government about a matter of public concern; and (3) portions of Texas Disposal's claims were time-barred by the statute of limitations. Waste Management also specially excepted that Texas Disposal had failed to plead sufficient facts to support each of its claims, primarily based on a lack of proof concerning causation and damages.

Waste Management moved for partial summary judgment in January 2001, seeking dismissal of Texas Disposal's claims based on the 1998 Communications, which had been added to the petition in 2000, because they were not pled within the applicable one- and two-year statutes of limitations.[6] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002-.003 (West 2002 & Supp. 2006) (limitations periods for defamation, tortious interference, and business disparagement). Texas Disposal responded that the 1998 Communications claims were not time-barred because they related

---

[6] The motion also sought to dismiss claims based on Waste Management's hiring of Texas Disposal's former employees, which had been added in Texas Disposal's July 2000 amended petition, as being barred by res judicata because they were subject to a final judgment in a separate suit in Bexar County. These claims were ultimately dismissed and are not a part of this appeal.

back to the original pleading, which broadly alleged that Waste Management had "routinely" engaged in a pattern of improper conduct that was "ongoing and continuous." *See id.* § 16.068 (West 1997).

The trial court granted Waste Management's motion for partial summary judgment, holding that Texas Disposal's claims based on the 1998 Communications were new and distinct transactions that did not relate back and were, therefore, barred by the statute of limitations. *See id.* §§ 16.002-.003, .068. Accordingly, on March 2, 2002, the court dismissed those claims with prejudice.[7]

Texas Disposal filed a third amended petition in May 2002, adding antitrust claims against Waste Management for its "attempt to monopolize" in violation of Texas Business and Commerce Code section 15.05(b). Texas Disposal claimed that, because Waste Management held more than 45% of the San Antonio market and 38% of the Austin market, its efforts to eliminate competition by disparaging Texas Disposal resulted in a "dangerous probability of achieving monopoly power." *See* Tex. Bus. & Com. Code Ann. § 15.05(b) (West 2002). Texas Disposal relied in part on the 1998 Communications as support for this claim, which was not limited by a two-year statute of limitations. *See id.* § 15.25 (West 2002).

In turn, Waste Management sought another motion for partial summary judgment. *See* Tex. R. Civ. P. 166a(c), (i). For each of Texas Disposal's claims, Waste Management

---

[7] Subsequently, the court reconsidered this ruling, prompting Waste Management to file a renewed motion for partial summary judgment on the issue, to which Texas Disposal filed a response. In its March 25, 2003 summary judgment order, the court again resolved the issue in favor of Waste Management.

asserted nearly twenty separate grounds for dismissal, including the statute of limitations, the protection afforded to privileged communications in petitioning the government, and that assorted essential elements of Texas Disposal's claims had been conclusively negated and/or lacked any evidentiary support.

Texas Disposal then filed its own motion for partial summary judgment, asking the court to hold as a matter of law that (1) the Action Alert memo was "published," (2) the memo was defamatory and defamatory per se, (3) the statements within and impressions arising from the memo were false, (4) Waste Management knew of this falsity at the time of publication, and (5) a contract existed between Texas Disposal and the City of San Antonio upon which its claim for tortious interference was based.

On March 25, 2003, the trial court signed a "final, corrected order" of summary judgment on both Waste Management's and Texas Disposal's motions; the court granted and denied portions of each party's motion. In the order, the court specifically delineated the grounds for its rulings. In relevant part to this appeal, the trial court's order concluded that:

(1) Texas Disposal's claims based on the 1998 Communications for defamation, tortious interference, and business disparagement were time-barred by the statute of limitations;

(2) the March and May 1998 memos were privileged by Waste Management's right to petition the government/public interest privilege;

(3) material fact issues remained about the essential elements of proximate cause, falsity, and damages on Texas Disposal's defamation claims;

(4) the Action Alert memo was "published" and contained certain statements that were reasonably capable of defamatory meaning; specifically, as a matter of law, the following statements in the Action Alert were "defamatory":

7

(a)   that the Texas Disposal facility "applied for and received an exception to the EPA subtitle D environmental rules";

(b)   that "Other landfills in Central Texas and San Antonio in similar clay formations are using the full synthetic liner in addition to clay soils";

(c)   the impression or implication that the Texas Disposal facility is environmentally less protective than other area landfills, including Waste Management's;

(d)   the impression or implication that the Texas Disposal facility does not have a leachate collection system[8];

(5)   Texas Disposal is, as a matter of law, a limited purpose public figure that must prove "actual malice" to prevail on its defamation claim, but a fact issue remained on that element because Waste Management failed to conclusively negate actual malice;

(6)   at the time of Waste Management's allegedly tortious interference with an existing contract, no contract existed between Texas Disposal and San Antonio for the operation of the Starcrest Transfer Station, and no claim was pled by Texas Disposal about tortious interference with an Austin contract; thus, Texas Disposal's claim for tortious interference with an existing contract was dismissed for no evidence;

(7)   Waste Management's alleged interference with a prospective contract between Texas Disposal and San Antonio, and between Texas Disposal and Austin, did not prevent the formation of these contracts; Waste Management's alleged interference with a prospective contract did not proximately cause any damage or loss to Texas Disposal; thus, these claims were dismissed for no evidence;

(8)   although there was evidence of Waste Management's specific intent to monopolize, its conduct allegedly performed in an attempt to monopolize did not, as a matter of law, constitute predatory or anticompetitive conduct, and did

---

[8]  The record reflects that leachate is "any liquid that comes in contact with garbage." The liquid may result from nature or may be generated by the waste in the landfill. Because this liquid is polluted, state and federal regulations (such as "Subtitle D" of the EPA rules) require that landfills have a method of collecting, extracting, and disposing of it. By implying that Texas Disposal's landfill had no leachate collection system, the memo implied that the landfill failed to comply with Subtitle D.

not create a dangerous probability of achieving monopoly power over the waste management markets in San Antonio or Austin; thus, these claims were dismissed for no evidence.

Thus, following the court's order, the only claim remaining for trial on the merits was defamation related to the Action Alert memo, on which Texas Disposal was required to prove actual malice.[9]

Texas Disposal specifically requested that the jury charge include questions, definitions, and instructions regarding defamation per se and the related issue of presumed damages.[10] Waste Management objected to the inclusion of these issues in the charge. Ultimately, the jury charge submitted by the court did not ask the jury whether the statements were defamatory per se nor instruct the jury on presumed damages. Instead, the charge asked only whether the statements were false; whether there was clear and convincing evidence that Waste Management knew of the falsity or had serious doubts about the statements' truth (i.e., whether Waste Management had published the statements with actual malice); whether Waste Management had acted with common law malice; and what amount of damages, both actual and exemplary, should be awarded.

The jury found that the statements were false and that, by clear and convincing evidence, Waste Management knew of the falsity or had serious doubts about their truth. Thus, the jury entered an affirmative finding on actual malice. Nonetheless, the jury determined that Waste

[9] Although the summary judgment order also found fact issues remaining on the business disparagement claim, thereby preserving the claim for trial, it is not relevant here because the claim was dismissed on directed verdict, and Texas Disposal did not raise the dismissal of this claim as an issue on appeal.

[10] Also, at the close of the evidence Texas Disposal requested a partial directed verdict on the issue of defamation per se, which the trial court denied.

Management's publication of the Action Alert caused zero actual damages to Texas Disposal. Further, the jury concluded that Waste Management had not acted with common law malice and, therefore, awarded no exemplary damages. In accordance with this verdict, on August 5, 2003, the court entered a final, take-nothing judgment against Texas Disposal. Following an unsuccessful motion for new trial, Texas Disposal filed this appeal.

## DISCUSSION

Texas Disposal challenges the judgment in the following six issues: whether (1) the trial court erred in refusing to question and instruct the jury regarding Texas Disposal's defamation per se claim and presumed damages, (2) the jury's finding of zero damages is against the great weight and preponderance of the evidence, (3) the court erred in dismissing the 1998 Communications claims on statute of limitations grounds, (4) the court erred in ruling that the March and May 1998 memos were privileged communications, (5) the court erred in dismissing Texas Disposal's claims for tortious interference with an existing and/or prospective contract, and (6) the court erred in dismissing the attempted monopolization/antitrust claim. In a cross point, Waste Management argues that the take-nothing judgment should be affirmed because there was not clear and convincing evidence of actual malice. We will begin with Waste Management's cross point and then address each of Texas Disposal's issues in turn.[11]

---

[11] As an initial matter, Texas Disposal claims that this Court lacks jurisdiction over Waste Management's cross point because Waste Management did not file a separate notice of appeal on the issue of affirming the take-nothing judgment based on a lack of evidence about actual malice. *See* Tex. R. App. P. 25.1(c). According to Texas Disposal, a separate notice of appeal is necessary because Waste Management seeks greater relief by this cross point than was granted by the trial court. We disagree and address the merits of Waste Management's cross point. *See Helton v.*

10

**Actual Malice**

Waste Management argues that, even if Texas Disposal's issues regarding its defamation claims are sustained on appeal, the take-nothing judgment should be affirmed because there is not legally sufficient evidence to uphold the jury's finding of actual malice.

To prevail on a defamation claim, a plaintiff who is a limited purpose public figure, such as Texas Disposal,[12] must prove by clear and convincing evidence that the defendant published the allegedly defamatory statements with actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Actual malice means that the defendant published the statement either with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Turner v. KTRK-TV, Inc.*, 38 S.W.3d 103, 119-20 (Tex. 2000). Evidence is "clear and convincing" if it supports a firm conviction on behalf of the trier of fact that the fact to be proved is true. *Bentley v. Bunton*, 94 S.W.3d 561, 596-97 (Tex. 2002).

In reviewing a jury's determination on the issue of actual malice, the First Amendment requires that we independently decide whether the evidence in the record is sufficient to pass the constitutional threshold, which bars a public figure's recovery for defamation when

---

*Railroad Comm'n*, 126 S.W.3d 111, 119 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (distinguishing (1) cross points requiring separate notice of appeal because they seek to alter judgment by seeking more relief than was granted in judgment from (2) cross points that do not require separate notice of appeal because they present merely an alternative basis for affirming judgment); *First Gen. Realty Corp. v. Maryland Cas. Co.*, 981 S.W.2d 495, 503 (Tex. App.—Austin 1998, pet. denied) (no separate notice of appeal is needed for appellees to present alternative grounds for affirming take-nothing judgment).

[12] Texas Disposal does not contend that the trial court erred in ruling that it is a limited purpose public figure.

11

the element of actual malice is not supported by clear and convincing proof. *Bose Corp. v. Consumers Union*, 46 U.S. 485, 510-11 (1984). Although questions regarding the sufficiency of the evidence are traditionally questions of law, we do not treat this inquiry as a "pure question of law" because it involves issues of credibility. *Harte-Hanks Commc'ns*, 491 U.S. 657, 685 (1989); *Bentley*, 94 S.W.3d at 597. "No constitutional imperative can enable appellate courts to do the impossible— make crucial credibility determinations without the benefit of seeing the witnesses' demeanor. If the First Amendment precluded consideration of credibility, the defendant would almost always be a sure winner as long as he could bring himself to testify in his own favor." *Bentley*, 94 S.W.3d at 597.

Thus, in determining whether there was sufficient evidence to support the jury's determination on actual malice, we give some amount of deference to the fact finders and review the factual record in full. *Id*. at 598. The supreme court has set forth specific steps to be taken in conducting such a review:

> [A]n independent review of evidence of actual malice should begin with a determination of what evidence the jury must have found incredible. . . . Next, undisputed facts should be identified. . . . Finally, a determination must be made whether the undisputed evidence along with any other evidence that the jury could have believed provides clear and convincing proof of actual malice.

*Id*. at 599 (citing *Harte-Hanks*, 491 U.S. at 690-91). The *Bentley* court further explained that, even if a defendant testifies in favor of itself, "[t]he fact finder may choose with reason to disregard the defendant's testimony." *Id*. If the jury's decisions regarding credibility are reasonable, then the appellate court must defer to the jury's determinations. *Id*.

12

Here, the jury answered "yes" when asked whether there was clear and convincing evidence that Waste Management published the Action Alert memo with knowledge of its falsity or with serious doubts about its truth. The jury was instructed that, for purposes of this question, Waste Management "means only those persons, including Don Martin and Al Erwin,[13] in the WMT organization who had responsibility for the publication of the Action Alert memo."[14]

The Action Alert memo reported that "[t]he San Antonio City Council is currently considering a proposal to greatly increase the amount of their municipal waste they truck 70 miles to Travis County . . . to the Texas Disposal System. . . . PLUS the proposal calls for privatizing San Antonio's Starcrest Transfer Station with TDS taking over the operations." The memo then discussed what types of waste Texas Disposal would be hauling: "TDS may bring municipal solid waste, commercial waste, special waste, construction waste, roll-off containers, and sludge and liquid waste. . . . There are no restrictions on the types of waste that may be disposed of at the TDS landfill, with the exception of hazardous waste." Next, the memo contained a paragraph regarding environmental concerns, which included warnings that the Texas Disposal contract would "result in a large increase in heavy truck traffic along IH-35 . . . [and] a commensurate increase in the amount of air traffic emissions . . . and the potential for accidents." The trial court ruled in its March 23, 2003 order that all of the above statements (except the

---

[13] Martin was the consultant hired by Waste Management to prepare the memo. Erwin was one of Martin's primary sources of information relating to the landfill liner and leachate collection system issues discussed in the Action Alert memo.

[14] The jury was further instructed on the meaning of clear and convincing evidence.

statement that San Antonio's arrangement with Texas Disposal was a "proposal") were reasonably capable of a defamatory meaning.[15]

The portion of the memo causing Texas Disposal the greatest concern is subtitled "Landfill Liner and Leachate Collection." The trial court specifically ruled in its March 2003 order that the statements in and the implications created by this paragraph were defamatory. In full, this paragraph stated:

> Unlike other landfills in the Travis County area, TDS's landfill applied for and received an exception to the EPA Subtitle D environmental rules that require a continuous synthetic liner at the landfill and a leachate collection system utilizing a leachate blanket to collect water that comes in contact with garbage (so that it cannot build up water pressure in a landfill). TDS requested and received state approval to use only existing clay soils as an approved "alternative liner" system, rather than use an expensive synthetic liner over the clay. Other landfills in Central Texas and San Antonio in similar clay formations are using a full synthetic liner in addition to the clay soils.

Finally, the memo concluded with a call to action, encouraging readers to "contact the San Antonio Mayor, City Council, and Public Works Director . . . [a]nd/or contact the San Antonio Express News with your concerns. Also contact Travis County officials to let them know of your environmental and traffic concerns."

As instructed by *Bentley*, we begin our independent review by examining the favorable evidence offered by Waste Management to determine what the jury must have found incredible. *See id*. Martin, the author of the memo, testified that, at the time of publication, he did

---

[15] The trial court also ruled, however, that the statement about increased traffic on IH-35 was not actionable because it was "opinion, rhetoric, or hyperbole."

14

not believe any of the statements to be false and did not entertain serious doubts about the truth, and that he still believes the statements to be true. Martin further contended that he did not intend the memo to convey that Texas Disposal's landfill was illegal, environmentally unsound, or lacking a leachate collection system. Erwin, the Waste Management employee who provided Martin information concerning the landfill's lining and leachate collection system, similarly testified that he did not provide any information to Martin that he knew to be false or about which he seriously doubted the truth. Erwin also testified that TNRCC staff people expressed concerns about the integrity of Texas Disposal's landfill.

Based on the jury's affirmative answers to falsity and actual malice, the jury must have disbelieved these self-serving statements. As long as that determination was reasonable, we too should ignore this evidence. *See id*. (discussing *Harte-Hanks*, 491 U.S. at 690-91, in which Court upheld jury's disregard of "defendant's self-serving assertions regarding its motives and its belief in the truth of its statements"). In light of the undisputed evidence and the remainder of Martin's and Erwin's testimony, we conclude that the jury had reason to disbelieve their denials.

A primary topic discussed in the testimony of both Martin and Erwin was the portion of the Action Alert memo contrasting (1) Texas Disposal's use of an "alternative liner" system through an "exception" to the EPA rules with (2) other landfills' usage of "a continuous synthetic liner at the landfill and a leachate collection system utilizing a leachate blanket" as "required" by Subtitle D of the rules. It is undisputed that this portion of the memo created a false and defamatory impression that Texas Disposal's landfill is environmentally unsound and is less protective than

15

other landfills, including Waste Management's.[16] The falsity of these statements arises because, in reality, there are two methods of complying with Subtitle D, the performance design method and the synthetic liner system. The evidence in the record demonstrates that these two methods are environmentally equal. It is further undisputed that Texas Disposal's landfill had been approved and licensed by the TNRCC and that, because Texas Disposal's landfill was located in a "low permeability" clay formation, it had some environmental advantages over other landfills. Moreover, not all of the landfills operated by Waste Management have a full synthetic lining. Thus, contrary to what was reported in the Action Alert, Texas Disposal's landfill is compliant with Subtitle D and is not environmentally unsound or less protective than Waste Management's.

Martin acknowledged that he "had a . . . fairly good understanding of the overall emphasis of Subtitle D" and that, through the course of his career, he "absolutely" had been able "to discuss Subtitle D liner landfill issues with engineers." Martin also testified that, at the time he wrote the memo, he understood that there were two ways to comply with Subtitle D (a performance design or a composite liner) and that he understood that Texas Disposal's "alternative design" was in compliance with Subtitle D. Martin also knew at the time he wrote the memo that Texas Disposal's landfill had been licensed by the TNRCC and that it (according to his own testimony) was located in one of the most "environmentally suitable locations" due to the "low permeability clay," which he considered to "off-set" the lack of a synthetic liner. Nonetheless, Martin said that he

---

[16] The trial court ruled as such in its March 2003 summary judgment order, and Waste Management does not challenge that ruling on appeal. *See supra* footnote 8 and accompanying text.

16

"assumed" that Texas Disposal's landfill was environmentally unsound because he considered the alternative design to be a "loophole around" the federal regulations.

Martin also admitted that the intent of saying that Texas Disposal's landfill was an "exception" to the EPA rules was "to convey the message that [Texas Disposal's landfill is] not [in] compliance with Subtitle D." Martin testified that the statement was "intended to be a negative." He further agreed that the "statement was intended to be a negative comment for consumption by the public generally" and that the "ultimate use of it would be to get back to the City of San Antonio [officials] . . . negatively." He agreed that the ultimate intent of the Action Alert was to prevent San Antonio from awarding its contract to Texas Disposal and that "the negative comment that [Texas Disposal's landfill] was not in compliance with Subtitle D" was specifically used as a means to achieve that purpose. When asked whether it was his "intention with the Action Alert to give the reader the impression that the EPA Subtitle D environmental rules required a continuous synthetic liner at the landfill and a leachate collection system that TDSL did not have," Martin responded, "yes." Martin also testified that, at the time he authored the memo, people in Austin were upset with San Antonio regarding water supply issues, and he agreed that he "saw the Action Alert memo as an opportunity to try to tap into some of that outrage and resentment about San Antonio."

This testimony presents evidence to support a finding of actual malice because it demonstrates that, at the time Martin wrote the Action Alert memo, he knew (1) that Texas Disposal's landfill was compliant with Subtitle D, (2) that the "performance design" and "synthetic liner" systems were considered equally environmentally sound methods of complying with Subtitle D, and (3) that the statements would create the negative impression that Texas Disposal's landfill

17

was less environmentally sound than Waste Management's and/or not in compliance with Subtitle D. If a speaker has reason to "strongly suspect" that his representation of the facts is misleading, then it is considered a "calculated falsehood" for purposes of actual malice. *Turner*, 38 S.W.3d at 120. Moreover, Martin testified that the purpose of the Action Alert was to hurt Texas Disposal in the competition between it and Martin's client, Waste Management. Although "actual malice" is not synonymous with ill will, spite, or evil motive, evidence that the defendant harbored ill will towards the plaintiff is often probative on the issue of whether the defendant was reckless with the truth in publishing the statements. *See Bentley*, 94 S.W.3d at 602; *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). Also, Martin's decision to leave out any mention of the Texas Disposal landfill's advantageous location in "low permeability" clay indicates his intent to create a false impression that the landfill was environmentally unsound. *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 425-26 (Tex. 2000) (defendant's selective omission of facts to purposefully create false portrayal of events was evidence of actual malice); *see also Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (in case regarding defamatory statements made by company about its competitor, Fifth Circuit upheld jury's finding of actual malice based on evidence that defendant "had the motive to publish a false report and that it acted negligently in preparing the report. More importantly, evidence in the record demonstrates that [defendant] was aware of information directly contradicting its findings but failed to explain these contrary results.").

Finally, Martin testified that he made no attempt to verify any of the information in the Action Alert memo with any person outside of the Waste Management organization; he did not verify his statements with anyone at the TNRCC or with any independent engineers or

18

environmentalists, and he did not seek a response from Texas Disposal.[17]  Although the failure to investigate does not, on its own, demonstrate actual malice, a purposeful avoidance of the truth does. *See Harte-Hanks*, 491 U.S. at 692 (ignoring two sources that could objectively verify allegations was purposeful avoidance of discovering facts that might show allegations' falsity); *Bentley*, 94 S.W.3d at 601 (actual malice existed where defendant "deliberately ignored" "all those who could have shown [him] that his charges were wrong").  Here, Martin completely failed to talk to anyone outside of Waste Management—a company that was paying Martin specifically to create a public perception that its landfill services were superior to those of its competitor, Texas Disposal—when there were people available in Austin who could have easily verified whether the information reported in the memo was true or false.  Under these circumstances, and in addition to the evidence discussed above, we consider Martin's failure to independently verify any of the information to be indicative of actual malice.  *See Bentley*, 94 S.W.3d at 601.

Erwin (the source of much of this information) similarly testified that he understood Waste Management would benefit from the Action Alert memo because "the public would perceive

---

[17]  Martin also provided inconsistent testimony about the review and approval of the memo that he obtained from Waste Management personnel.  He initially testified in his deposition, which was read aloud to the jury, that people from Waste Management (specifically, Loren Alexander) had reviewed and given final approval to the memo before he submitted it for a "fax blast" to the Austin "environmental community."  Then, in live testimony, Martin announced that, because he had since read Alexander's deposition in which he denied approving the memo, Martin was changing his testimony to say that Alexander had not approved the memo.  While this is not direct proof that Martin knew of the falsity or seriously doubted the truth about the statements in the Action Alert, it does provide circumstantial evidence about his overall credibility as a witness.  From Martin's equivocating about who was ultimately responsible for the statements in the memo, the jury could infer that Martin was willing to alter his testimony to protect himself and/or his long-time associates at Waste Management.

that one of them [Waste Management] was more environmentally responsible than the other [Texas Disposal]." Erwin admitted, however, that when he told Martin that other area landfills were using full synthetic liners, he knew that not all of Waste Management's landfills were fully lined. He also acknowledged understanding at the time that "performance design" and "synthetic liner" are two alternative methods for complying with Subtitle D, meaning that Texas Disposal's method was equally compliant. For the same reasons we discussed concerning Martin's testimony, Erwin's testimony provides evidence of actual malice. *See Brown*, 965 F.2d at 47; *Bentley*, 94 S.W.3d at 601-02; *Huckabee*, 19 S.W.3d at 425-26.

Based on the above, there is clear and convincing evidence in the record that, when Martin authored the Action Alert and when Erwin provided him information to include in the Action Alert, they, at a minimum, had serious doubts about its accuracy. Thus, we overrule Waste Management's cross point and affirm the jury's finding of actual malice. Consequently, we proceed to Texas Disposal's first issue.

**Charge Error**

In its first issue, Texas Disposal urges that the trial court's refusal to submit certain questions and instructions in the jury charge related to defamation per se and presumed damages constitutes reversible error. In determining whether the jury charge was in error, we review the trial court's refusal to submit the particular items for an abuse of discretion. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). Although the trial court has considerable discretion to determine which jury instructions are necessary and

20

proper, the court is required to submit questions, instructions, and definitions that are raised by the written pleadings and supported by the evidence. Tex. R. Civ. P. 278; *In re V.L.K.*, 24 S.W.3d at 341. "Rule 278 is a directive to trial courts requiring them to submit requested questions to the jury if pleadings and any evidence support those questions." *4901 Main, Inc. v. TAS Auto., Inc.*, 187 S.W.3d 627, 630 (Tex. App.—Houston [14th Dist.] 2006, no pet.). A trial court may refuse to submit a question to the jury if (1) there is no evidence, (2) there are no pleadings, or (3) the issue is uncontroverted. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Assoc.*, 710 S.W.2d 551, 555 (Tex. 1986). We will not reverse a judgment based on charge error in the absence of harm, which results if the error "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." Tex. R. App. P. 44.1; s*ee Harris County v. Smith*, 96 S.W.3d 230, 234-35 (Tex. 2002); *Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex. 1995).

Here, Texas Disposal specifically complains that the trial court "erroneously refused to query the jury as to whether the Action Alert was defamatory per se, or to correctly instruct the jury that it could find presumed damages for a statement that is defamatory per se." We agree.[18]

---

[18] Waste Management contends that the issue briefed by Texas Disposal preserved error only on the lack of a defamation per se *question*, but not the accompanying *instruction*. We reject this hyper-technical interpretation. It is clear from Texas Disposal's complaint about the court's failure to "query" the jury that Texas Disposal is collectively complaining about the court's refusal to submit the relevant questions and instructions regarding defamation per se and presumed damages. For instance, one of the subheadings of Texas Disposal's first issue states, globally, that "TDSL was entitled to a jury charge consistent with the law of defamation per se" and thereafter discusses error regarding both the question and instructions. Texas Disposal has effectively presented this issue for our review. *See* Tex. R. App. P. 38.1(e) ("statement of an issue will be treated as covering every subsidiary issue that is fairly included").

21

Under Texas law, a statement is defamatory if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2005). There are two types of defamation: per quod and per se. *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). Statements that are defamatory per quod are actionable only upon allegation and proof of damages. *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.—Corpus Christi 2003, no pet.); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 459 (1976) (evidence of injury is required to support award of compensatory damages in defamation case). Thus, before a plaintiff can recover for defamation per quod, the plaintiff must carry his burden of proof on both the existence of and amount of damages. *See Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984); *Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.).

On the other hand, statements that are defamatory per se are actionable without proof of injury. *Bentley*, 94 S.W.3d at 605; *Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (statement is considered defamatory per se if words are so obviously hurtful to plaintiff's reputation that they require no proof of their injurious character to make them actionable). Thus, if the alleged statements have been classified as defamatory per se, general damages are presumed without requiring specific evidence of harm to the plaintiff's reputation thereby entitling the plaintiff to recover, at a minimum, nominal damages. *Bentley*, 94 S.W.3d at 604 ("As a matter of law . . . [defamatory per se statements] entitle [plaintiff] to recover actual damages for injury to his reputation and for mental anguish."); s*ee also Snead v. Redland Aggregates*

22

*Ltd.*, 998 F.2d 1325, 1331 (5th Cir. 1993) (explaining critical distinction under Texas law between proof required to recover damages for defamation versus defamation per se).[19] A false statement will typically be classified as defamatory per se if it injures a person in his office, profession, or occupation, *Knox*, 992 S.W.2d at 50; charges a person with the commission of a crime, *Leyendecker*, 683 S.W.2d at 374; imputes sexual misconduct, *Moore*, 166 S.W.3d at 384; or accuses one of having a loathsome disease, *Bolling v. Baker*, 671 S.W.2d 559, 570 (Tex. App.—San Antonio 1984, no writ); *see also Alaniz*, 105 S.W.3d at 345.

The issue of whether statements are defamatory per se is generally a matter of law to be decided by the court. *West Tex. Utils. Co. v. Wills*, 164 S.W.2d 405, 411 (Tex. Civ. App.—Austin 1942, no writ). The trial court should consider the statements and determine whether, even without proof of harm, the statements were so obviously injurious to the plaintiff that, as a matter of law, the plaintiff is entitled to recover damages. *See Alaniz*, 105 S.W.3d at 345. The court may, however, pass the inquiry to the jury if it determines that an ambiguity exists about the meaning and effect of the words or that a predicate fact question remains about whether the statements were published

---

[19] There is a difference, however, between general and special damages. Even if the statements have been determined to constitute defamation per se, proof of the actual injury suffered is required to recover special damages such as lost profits, incurred costs, lost time value, and future injury—which were sought by Texas Disposal in this case. *See Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.); *Ryder Truck Rentals, Inc. v. Latham*, 593 S.W.2d 334, 337 (Tex. App.—El Paso 1979, writ ref'd n.r.e.); *see also Fox v. Parker*, 98 S.W.3d 713, 726-27 (Tex. App.—Waco 2003, pet. denied) (recovery of special damages requires jury to determine that defamatory statement proximately caused injury); *Knox v. Taylor*, 992 S.W.2d 40, 60-63 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (although damages for injury to reputation were presumed based on defamation per se, proof of actual lost profits was required); Restatement (Second) of Torts § 622 (1977).

23

or were false. *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987); *West Tex. Utils.*, 164 S.W.2d at 411.

Here, through both a motion for summary judgment and a request for directed verdict, Texas Disposal asked the court to rule as a matter of law that the statements in the Action Alert memo were defamatory per se. The trial court denied both requests. By these rulings, however, the trial court did not affirmatively rule that the statements were not defamatory per se. Rather, these rulings demonstrate merely that, prior to the conclusion of the trial, the court was not convinced as a matter of law that no ambiguities remained on the issue. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (summary judgment or directed verdict is only appropriate if evidence is so clear that reasonable jurors could reach only one conclusion).

The trial court entertained multiple pleadings from both parties in preparing the jury charge. Through the course of these proceedings, Texas Disposal undeniably preserved the charge error it complains of here by submitting in writing substantially correct questions and instructions related to these issues, separately and specifically objecting in writing to the exclusion of these requests in Waste Management's and the court's proposed charges, and obtaining rulings on its requests and objections. *See* Tex. R. Civ. P. 272-274; *First Valley Bank v. Martin*, 144 S.W.3d 466, 474-76 (Wainwright, J., concurring) (discussing preservation of charge error under *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 238-41 (Tex. 1992)).

Specifically, Texas Disposal proposed that the jury be asked whether "any of the following statements, impressions, or implications from the Action Alert . . . are defamatory, and, if defamatory, were they defamatory per se?" in connection with instructions that a "statement is

24

defamatory per se if it tends to affect an entity injuriously in its business, occupation, or office, or charges an entity with illegal or immoral conduct" and that, in making its determination, the jury should "consider a reasonable person's perception of the statement, impression, or implication in the context of the Action Alert as a whole, and in light of the surrounding circumstances." Texas Disposal further requested that the jury be instructed that answering "yes" to the defamatory per se question means "damage to reputation is presumed and no proof of actual damage to reputation is required. If you did not find a statement defamatory per se, there must be evidence of injury to reputation for damage to be awarded for this element."[20]

It was erroneous for the trial court to refuse to submit these questions and instructions to the jury because they were raised by the written pleadings and supported by the evidence—namely, evidence that Waste Management libeled Texas Disposal in a manner injurious to its business. *See* Tex. R. Civ. P. 278 (court is required to submit questions, instructions, and

---

[20] Waste Management argues in its "Motion for Further Rehearing" that this "Court made a key mistake" by "ignoring" the fact that, in refusing to submit Texas Disposal's requested instruction and question, the trial court "impliedly rule[d] that there was no defamation per se as a matter of law." First, we note that the court's refusal to submit the requested instruction and question were discussed. Second, to the extent Waste Management believes this "ruling" insulates it from appellate review, we disagree because this appeal was filed for the purpose of challenging that decision.

Further, the court's refusal to include Texas Disposal's proposed instruction and question should not be confused with the court's prior denials of Texas Disposal's requests to rule as a matter of law on defamation per se through motions for summary judgment and directed verdict. The importance of recognizing that those denials did not constitute a final ruling on the defamation per se issue is because the issue remained open for decision at the time the charge was prepared. At that point, it is correct that the trial court affirmatively decided that the statements were not defamatory per se and, accordingly, refused to query the jury on the issue. This decision, however, is appealable and was in error.

25

definitions raised by written pleadings and supported by evidence); *Knox*, 992 S.W.2d at 50 (evidence that statements were understood by recipient as being injurious to plaintiff's business supports finding of defamation per se). Although defamation per se is generally a legal question, in this case there were underlying ambiguities that could not be decided as a matter of law and needed to go to the jury.[21]

This Court's prior opinion in *West Texas Utilities Co.*, 164 S.W.2d 405, is instructive on this issue. There, the defendant made a statement that was injurious to the plaintiff's occupation, and the court refused to submit an issue to the jury regarding the statement's slanderous nature. *Id*. at 408. The defendant argued that the issue of defamation per se was not appropriate for the jury's consideration because statements should only be deemed defamatory per se as a matter of law when it is possible to make that determination "on their face, without innuendo or explanation." *Id*. at 411. This Court disagreed, adopting the Restatement's view that the trial court should "determine[] whether a communication is capable of a defamatory meaning," but it is up to the jury to

---

[21] Waste Management asserts that Texas Disposal failed to present an argument on appeal that fact issues remained regarding defamation per se. We disagree. Texas Disposal argued in its opening brief that the trial court erred by failing to instruct and question the jury "regarding whether the Action Alert was defamatory per se. . . . Specifically [Texas Disposal] requested that the trial court give the jury a proposed Question 1 to determine whether certain statements in the Action Alert, and the Action Alert as a whole, constituted libel per se." It is implicit within Texas Disposal's argument that it believed fact questions remained on the issue of defamation per se because the existence of fact questions provides the basis for arguing that the jury—the fact finders—should have been queried on the issue. *See* Tex. R. App. P. 38.1(e) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690, 32 Tex. Sup. Ct. J. 266 (Tex. 1989) ("[I]t is our practice to construe liberally points of error in order to obtain a just, fair, and equitable adjudication of the rights of the litigants.") Furthermore, Texas Disposal elaborated on this claim in its reply brief by asserting that "[a] fact issue was raised as to defamation per se, and thus the issue should have been submitted to the jury."

"determine[] whether a communication, capable of a defamatory meaning, was so understood by its recipient." *Id*. This Court further explained that the trial court should make the initial determination as to "whether it is actionable, either per se or per quod, but where it is ambiguous, of doubtful import, or susceptible of two or more interpretations, its actionability must ordinarily be decided by the jury under appropriate instructions from the court." *Id*. Only after the underlying fact questions (such as those regarding publication and "the meaning of the words conveyed to the recipient") are decided does the question of law arise as to "whether the words are [defamatory] per se." *Id*. Thus, the plaintiff in *West Texas Utilities* was entitled to its requested instruction and question in the jury charge. *Id*.

Here, a jury was needed to determine the exact meaning and effect of the words because much of the Action Alert's defamatory character arose not from its blatant statements but, rather, from the impressions it created and inferences it encouraged. *See id.* (jury to determine how statement was understood by recipient); *see also Musser*, 723 S.W.2d at 655 (predicate fact question about meaning and effect of words may be passed to jury); Restatement (Second) of Torts § 614, cmt. b (1977) (if judge decides statement is capable of defamatory meaning, then "further question" exists for jury of "whether the communication was in fact understood by its recipient in the defamatory sense"). A fact issue also remained as to whether or not the statements in the Action Alert were false, as demonstrated by the trial court's denial of both Waste Management's and Texas Disposal's summary judgment motions on the issue of falsity. Because there was some evidence in the record upon which a reasonable juror could find that the statements in the Action Alert memo were false and understood by the recipient to injure Texas Disposal's business reputation, the trial

27

court erred in refusing to submit Texas Disposal's requested question and instructions. Further, the court's failure to query the jury on defamation per se was harmful to Texas Disposal because it, in turn, prevented Texas Disposal from having an instruction included in the charge about presumed damages and, thereby, from potentially recovering some amount for these damages. Accordingly, the error in the court's charge "probably caused the rendition of an improper judgment." *See* Tex. R. App. P. 44.1.

Texas Disposal's first issue is sustained, and its defamation claims regarding the Action Alert are remanded to the trial court for a new trial consistent with this opinion. *See id*. 43.3(b).

## Damages Award

In its second issue, Texas Disposal contends that the jury's finding of zero damages is contrary to the great weight and preponderance of the evidence. In light of our conclusion that the jury should have been queried on defamation per se and presumed damages, it is necessary to also remand the damages issue because Texas Disposal will be entitled to some amount of presumed general damages if, on remand, the jury answers the defamation per se question affirmatively.

In its motion for further rehearing Waste Management disagrees with this conclusion and argues that, even when a jury is instructed that a plaintiff is entitled to presumed damages based on an affirmative finding of defamation per se, the jury may still opt to award zero damages. We disagree. With defamatory per se statements, general damages for injury to character, reputation, feelings, mental suffering or anguish, or other wrongs not susceptible to monetary valuation are presumed. *Mustang Ath. Corp. v. Monroe*, 137 S.W.3d 336, 339 (Tex. App.—Beaumont 2004,

28

no pet.) ("In *Leyendecker* and *Bentley*, the Supreme Court of Texas held statements which are defamatory per se entitle a plaintiff, as a matter of law, to recover actual damages for injury to reputation."); *Peshak*, 13 S.W.3d at 427 ("In actions of libel per se, the law presumes the existence of some actual damages, requiring no independent proof of general damages."); *Ryder Truck Rentals, Inc. v. Latham*, 593 S.W.2d 334, 337 (Tex. App.—El Paso 1979, writ ref'd n.r.e.) (defamation per se entitles plaintiff to presumed general damages for injury to character, reputation, feelings, mental suffering or anguish, and other wrongs not susceptible to monetary valuation).  Although the amount of actual general damages remains a question for the jury, when an affirmative finding of defamation per se has been entered and presumed damages are appropriate, the plaintiff is entitled to an award of at least one dollar in nominal damages, even if zero actual damages are awarded.  *See Doe v. Chao*, 540 U.S. 614, 621 & n.3 (1994) (emphasis added) (recognizing that, when presumed damages are appropriate in defamation actions, there is an "entitlement to recovery" because "common law rule would not require [plaintiff] to show particular items of injury in order to receive *a dollar recovery*").[22]

---

[22] Waste Management incorrectly argues in its motion that this holding "diverges from existing law." *See Peshak*, 13 S.W.3d at 427 (jury may opt to award only nominal damages when general damages are presumed in defamation per se case); *Denton Publ'g Co. v. Boyd*, 448 S.W.2d 145, 147 (Tex. Civ. App.—Fort Worth 1969), *aff'd*, 460 S.W.2d 881 (Tex. 1970) (upon finding of defamation per se, "[a]t least nominal damages must be awarded" in addition to "such actual damages as might be shown to be the proximate result of the publication"); *Express Pub. Co. v. Hormuth*, 5 S.W.2d 1025, 1027 (Tex. Civ. App.—El Paso 1928, writ ref'd) (because article was libelous per se and false, "court properly instructed the jury to find for plaintiff at least nominal damage"); *Mayo v. Goldman*, 122 S.W.449, 447 (Tex. Civ. App.—Texarkana 1909, no writ) (regarding defamation per se charge error, court held that, when words are defamatory per se and false, plaintiff is "entitled to recover at least nominal damages, without regard to [defendant's] intent in speaking"); *Houston Printing Co. v. Moulden*, 41 S.W. 381, 387 (Tex. Civ. App.—Austin 1897, writ ref'd) (court correctly instructed jury to find nominal damages for plaintiff regarding defamation

29

Although remanding for a determination on defamation per se and presumed damages does not always require that we also remand the issues of special and exemplary damages, we believe in this case that the damages arising from the defamation claims should be presented to the jury collectively because, otherwise, the presentation of evidence would be unfairly hindered and

per se even if he suffered no actual damages to character); *see also* (Restatement (Second) of Torts § 620 (where defamatory statement is actionable per se, defendant is liable for at least nominal damages); 4 Sharon L. Michaels, *Texas Torts & Remedies* § 52.09[1] (2006) ("[W]hen there is a finding that a defamatory statement is defamatory per se . . . it is proper for the trial court to instruct the jury to find at least nominal damages."); 24-2 *Texas Court's Charge Reporter* No. 99-2-22 (Lexis 2002) instructing jury that "Damages must be awarded for a statement that is defamatory per se, although the amount is within your discretion. Thus, you must award at least nominal damages, and such further damages, if any, as proximately resulted from defamatory statements.")

In challenging this holding, Waste Management relies on *Adolph Coors Co. v. Rodriguez* for the holding that "libel per se merely allows the aggrieved party to go to the jury without the requirement of specific proof of the injurious character of the libelous statement. It does not require the jury actually to find any amount of damages." 780 S.W.2d 477, 488 (Tex. App.—Corpus Christi 1989, writ denied) (citation omitted); *see also Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1331 (5th Cir. 1993) (citing *Adoph* for proposition that jury "may choose not to award presumed damages" in cases of libel per se) (also cited by Waste Management). *Adolph*, however, never mentions the concept of nominal damages and stands for the more specific proposition that exemplary damages are not available upon a finding of zero actual damages, 780 S.W.2d 488—which is true even if a party is entitled to or awarded nominal damages, as recognized by *Snead*, 998 F.2d at 1334 & 1335 n.15. *See* Tex. Civ. Prac. & Rem. Code § 41.004 (West Supp. 2006) (in defamation cases filed after September 2003, exemplary damages not recoverable absent award of actual damages in more than nominal amount).

To the extent that *Adolph* and *Snead* hold that the amount of actual damages is left in the jury's discretion and that proof of actual injury is required to recover special damages, we agree. However, to any extent the opinions hold that an entry of zero, rather than at least nominal, damages is appropriate in response to an affirmative finding of defamation per se, we disagree. Further, contrary to *Snead*, rather than considering nominal damages to be separate and apart from presumed damages, *see* 998 F.2d at 1334-35, we consider nominal damages to be a form of presumed damages that are appropriate when the jury determines that the defamatory per se statements have not caused substantial harm to plaintiff's reputation or when the purpose of the suit is simply to vindicate plaintiff's reputation. *See* Restatement (Second) of Torts § 620, cmt. a-b (explaining these as appropriate reasons for nominal damages in defamation per se cases).

30

piecemeal. A litigant is entitled to a fair trial before a jury that is properly instructed on the issues authorized and supported by the law governing the case. *Harris County, Tex. v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002). If the appellate court cannot say that the jury was not affected by the erroneous charge in arriving at the amount of damages, then the issue should be reversed and remanded. *Id*. Here, had the jury been properly instructed that certain damages may be presumed in light of finding defamation per se, the jury's consideration of all damages would likely have been different. *See* Tex. R. App. P. 44.1(a)(1) (reversal warranted where error complained of probably caused rendition of improper judgment); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723-24 (Tex. 2003) (while not technically incorrect, inclusion of spoliation instruction probably caused rendition of improper judgment because it "unfairly stigmatized" party, thereby "tilting" or "nudging" jury's view; thus, remand was necessary); *Jenkins v. Taylor*, 4 S.W.2d 656, 661 (Tex. Civ. App.—Austin 1928, writ dism'd) (where statements were defamatory per se and court's charge error "deprived the jury of finding damages based upon the general presumption of law that damages flow from the publication of a per se libel," court remanded for new trial); *see also LaGloria Oil & Gas v. Carboline Co.*, 84 S.W.3d 228, 242-43 (Tex. App.—Tyler 2001, pet. denied) (court remanded to allow same jury to determine issues of liability and limitations under correctly worded charge). Therefore, on remand, the jury should be questioned and instructed about special and exemplary damages as well as presumed damages.

Texas Disposal's second issue is sustained.

**Statute of Limitations**

In its third issue, Texas Disposal claims the trial court erred by granting summary judgment on its claims arising from the 1998 Communications. Texas Disposal advances two arguments to support its position that the claims were not barred by the statute of limitations. First, it argues that the 1998 Communications "relate back" to its original petition because they were part of a pattern of continuing wrongful conduct that started with the improper actions alleged in the original petition. Second, Texas Disposal argues that, even if the claims do not relate back, the claims are not barred by the statute of limitations because the claims arise from a continuing tort.

We review a trial court's grant of summary judgment de novo. *McCarthy Bros. Co. v. Continental Lloyds Ins. Co.*, 7 S.W.3d 727, 728 (Tex. App.—Austin 1999, no pet.). In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex. 1996). The statute of limitations is an affirmative defense, and a defendant is entitled to summary judgment upon presentation of sufficient evidence to conclusively establish each element of its affirmative defense as a matter of law. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Akin v. Santa Clara Land Co.*, 34 S.W.3d 334, 340 (Tex. App.—San Antonio 2000, pet. denied). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Friendswood Dev. Co.*, 926 S.W.2d at 282; *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).

Therefore, we must view the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See Great Am. Reserve Ins. Co.*, 391 S.W.2d at 47.

Texas Disposal first argues that the 1998 Communications relate back to its original petition because they are part of a pattern of continuing wrongful conduct that commenced with the actions that formed the basis of the original petition, not isolated acts. We disagree.

The statute of limitations is one year for defamation claims and two years for tortious interference with business relations. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), .003. The claims based on the 1998 Communications (which included memos sent in March and May 1998 and a press release issued on July 14, 1998) would have accrued on those respective dates of publication. Thus, the limitations period for the defamation claims based on each communication would have expired, respectively, in March and May 1999 and on July 14, 1999, and the limitations period for the tortious interference claims would have expired, respectively, in March and May 2000, and on July 14, 2000. *See id*. §§ 16.002(a), .003, .068. Texas Disposal did not amend its petition until July 25, 2000, after the statute of limitations for all of the alleged actions had expired.

Under the relation-back doctrine, an original pleading tolls the statute of limitations for claims asserted in subsequent, amended pleadings as long as the amendments are not based on new, distinct, or different transactions or occurrences. *Id*. § 16.068. A "transaction" is defined as a set of facts that gives rise to the cause of action premised thereon. *Id.*; *see Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 121 (Tex. App.—El Paso 1997, pet. denied). Texas law treats each alleged defamatory publication as a single transaction with an independent injury. *See Akin*, 34 S.W.3d at 340. The test is not whether the newly asserted claims are otherwise part of the same general course

33

or pattern of conduct as those originally pled. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.068; *Leonard v. Texaco, Inc.*, 422 S.W.2d 160, 163 (Tex. 1967); *Waddill v. Phi Gamma Delta Fraternity*, 114 S.W.3d 136, 144 (Tex. App.—Austin 2003, no pet.).

Under the relation-back test, the claims based on the 1998 Communications were "new" because they occurred after the original petition had been filed and were "distinct or different" because each communication was addressed to a different audience about different specific issues and was issued months apart from the other communications. Furthermore, under Texas defamation law, we treat each of the 1998 Communications as a separate transaction with an independent injury. *See Akin*, 34 S.W.2d at 340. Texas Disposal's contention that the acts are part of a pattern of wrongful conduct is not the focus of an inquiry under a relation-back analysis. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.068; *Leonard*, 422 S.W.2d at 163.

In its second argument, Texas Disposal asserts that the claims asserted in its July 25, 2000 amended petition are not time-barred because the 1998 Communications were part of a continuing tort that had not yet accrued. Generally, a cause of action accrues when a wrongful act causes an injury. *Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex. App.—Dallas 1994, writ denied). However, a continuing tort is an ongoing wrong causing a continuing injury that does not accrue until the tortious act ceases. *Id.* at 543 (pill taken daily that caused continuing injury is basis for continuing tort); *Adler v. Beverly Hills Hosp.*, 594 S.W.2d 153, 156 (Tex. Civ. App.—Dallas 1980, no writ) (although each day of false imprisonment is itself separate cause of action, court viewed involuntary detention without access to counsel in mental hospital as one continuing tort). A plaintiff can bring a single suit for the period of time it sustains injuries from

34

a defendant's conduct. *Upjohn*, 885 S.W.2d at 543; *Adler*, 594 S.W.2d at 156. The concept of a continuous tort originated in trespass-to-land and nuisance cases and has since been expanded to include false-imprisonment cases. *Upjohn*, 885 S.W.2d at 542. Treating regularly occurring torts, such as false imprisonment, as continuing torts avoids a multiplicity of suits and does not force an aggrieved plaintiff to choose between filing successive suits or facing denial of the privilege of the full limitation period in filing suit for each day of the false imprisonment. *Id.*; *Adler*, 594 S.W.2d at 156. However, if each of the defendant's separate behaviors caused a distinct injury, the continuing tort rule does not apply. *Upjohn*, 885 S.W.2d at 543.

Each of the 1998 Communications was a discrete transaction: each was addressed to a different audience, each concerned a different issue, each was issued months apart from the other communications, and each caused an independent injury. The 1998 Communications do not represent a constant, continuous pattern of tortious conduct that courts have found to constitute a continuing tort, such as each day of a false imprisonment or the daily consumption of a harmful medication. *See id.*; *Adler*, 594 S.W.2d at 156. Furthermore, Texas Disposal has not offered any authority, nor have we found any, that broadens the continuing tort doctrine to include actions based on defamation, tortious interference, or tortious acts that are intermittent and irregular in nature. Rather, our research has revealed only contrary authority. *See Dickson Constr. v. Fidelity & Deposit Co.*, 960 S.W.2d 845, 851-52 (Tex. App.—Texarkana 1997, no pet.) (disparaging comment, coupled with speaker's refusal to modify position and any harm that ensued, did not constitute continuing tort).

We hold that all of Texas Disposal's claims based on the 1998 Communications are time-barred because (1) Texas Disposal asserted them after the relevant limitations period expired, (2) the claims do not relate back to its 1997 petition, and (3) the claims do not constitute a continuing tort. Texas Disposal's third issue is overruled.

**Privileged Communications**

In its fourth issue, Texas Disposal complains that the trial court erred in granting summary judgment on Waste Management's ground that the March and May 1998 memos were privileged communications. Because we hold that any defamation claim resulting from the publication of the 1998 Communications is barred by limitations, we need not reach Texas Disposal's issue of whether these two memos were privileged communications under the "public interest" or "right to petition the government" exceptions to defamation. Texas Disposal's fourth issue is overruled.

**Tortious Interference**

In its fifth issue, Texas Disposal urges that the trial court erred in dismissing on summary judgment its claims for tortious interference with an existing and/or prospective contract. We begin with the existing contract claim and then turn to the prospective contract claim.

*Tortious interference with an existing contract*

Texas Disposal asserts that it had a viable contract with San Antonio in May 1995 and that, due to Waste Management's interference, the execution of the San Antonio contract was unduly delayed, causing Texas Disposal to suffer economic damages. We disagree.

36

A cause of action for tortious interference with an existing contract is based on the principle that a contract is a property right subject to protection from unwarranted interference. *See Raymond v. Yarrington*, 73 S.W. 800, 803 (Tex. 1903). Although a business is not protected from most forms of competition, it may have a superior right, by contract or otherwise, to be so protected in certain circumstances. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 717 (Tex. 2001). A cause of action for tortious interference will not lie in the absence of a contract. *S & A Marinas, Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 768 (Tex. App.—Austin 1994, writ denied).

Binding and enforceable contracts are formed when an offer is made and accepted, when there is a meeting of the minds, and when the terms are sufficiently certain to define the parties' obligations. *See Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and how they acted, not on their subjective state of mind. *Id*. If a trial court can determine conclusively that no contract existed, summary judgment is appropriate. *S & A Marinas, Inc.*, 875 S.W.2d at 768.

Texas Disposal asserts that the grant of summary judgment on this issue was error because Texas Disposal produced more than a scintilla of evidence that a contractual relationship existed between Texas Disposal and San Antonio at the time of Waste Management's interference. Texas Disposal further asserts that, even absent a formal contract, Texas Disposal's and San Antonio's relationship had matured to a point where Waste Management had a legal duty not to interfere.

37

To prove that it had a contract with the City of San Antonio, Texas Disposal relies on ordinances passed by the city council in May 1995 and December 1996, which, respectively, extended its disposal services contract and authorized the city manager to execute an agreement with Texas Disposal, subject to the addition and modification of material terms. It is undisputed, however, that a final contract between San Antonio and Texas Disposal was not executed in writing until January 7, 1998.

The May 1995 ordinance authorized the city manager or his representative to execute a contract with Texas Disposal for waste disposal services for a term not to exceed thirty years and authorized payment for the services. The ordinance did not discuss the Starcrest facility, an essential part of the final agreement. The terms of the ordinance indicate that the city manager was authorized to engage in negotiations to execute a contract that would be similar to the previous Texas Disposal contract and would conform to San Antonio's waste disposal services request for proposal guidelines. The authorization to negotiate and execute a contract is not tantamount to expressing an intent to be bound. *S & A Marinas, Inc.*, 875 S.W.2d at 768. Accordingly, the May 1995 ordinance did not create a contract between Texas Disposal and San Antonio.

In the alternative, Texas Disposal argues that a contract existed when the city council passed its December 1996 ordinance authorizing the city manager to execute an agreement with Texas Disposal pursuant to the "Proposed Agreement with Texas Disposal to Operate Transfer Station" subject to the addition or modification of some material provisions. The ordinance required the city manager to further negotiate and refine the terms of the agreement to give San Antonio the first right of use of and access to the transfer facility, to acquire the power to limit services available

to third parties, to acquire the power to change the composition of the oversight panel, to make the new contract independent of the old contract with Texas Disposal with respect to termination, and to add a term that would permit San Antonio to terminate the transfer station agreement for cause on account of a material breach. The ordinance also authorized the city council to veto any contract term that was materially different from the contract modifications listed in the ordinance.

The December 1996 ordinance is not evidence of a contract between San Antonio and Texas Disposal. To the contrary, the ordinance's language requiring the addition or modification of material terms affecting termination of the contract and San Antonio's use of the facility, as well as the clause requiring city council approval for contract terms that significantly differ from the requirements set forth in the ordinance, demonstrate San Antonio's continued interest in pursuing and negotiating a waste disposal contract with Texas Disposal. To hold that the brief and cursory language of the ordinances was sufficient to form a contract would contravene public policy allowing governmental agencies to reconsider actions taken with respect to a contract not yet finalized. *See S & A Marinas, Inc.*, 875 S.W.2d at 768.

We hold that the May 1995 and December 1996 ordinances did not demonstrate that a contract existed between San Antonio and Texas Disposal, and thus the trial court did not err in dismissing Texas Disposal's action for tortious interference with an existing contract.

*Tortious interference with a prospective contract*

Although Texas Disposal was eventually awarded both the San Antonio and Austin contracts it sought, Texas Disposal claims that it is entitled to damages for the alleged delays in obtaining the contracts caused by Waste Management's actions under a theory of tortious

interference with prospective contractual relations. *See Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 859 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414-15 (Tex. App.—Waco 2001, pet. denied). Texas Disposal asserts that it was error for the trial court to dismiss this claim on summary judgment. We disagree.

To prove a cause of action for tortious interference with prospective contractual relations, a plaintiff must establish the following elements: (1) a reasonable probability that the parties would have entered into a business relationship; (2) an intentional, malicious intervention or an independently tortious or unlawful act performed by the defendant with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; (3) a lack of priviledge or justification for the defendant's actions; and (4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., that the defendant's actions *prevented the relationship from occurring*. *See Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001) (agreeing with appellate court's analysis of issue); *Baty*, 63 S.W.3d at 860; *Ash*, 54 S.W.3d at 414-15. Conduct that is merely "sharp" or unfair is not actionable. *See Baty*, 63 S.W.3d at 860; *Ash*, 54 S.W.3d at 414-15.

Because Texas Disposal was awarded both contracts it sought, Texas Disposal cannot prove its third element, that Waste Management's actions prevented the contracts from forming. Thus, the trial court properly dismissed the claim on summary judgment. *See* Tex. R. Civ. P. 166a(c); *Rhone-Poulenc*, 997 S.W.2d at 223.

Implicit in Texas Disposal's claim is an invitation to expand the doctrine of tortious interference with prospective business relationships to make actionable conduct that results in

40

*delaying the execution* of a contract, even though the formation of a contract was not prevented. Delays caused by competitor conduct are inherent in the course of doing business, and enlarging the scope of tortious inference for prospective relationships to include delays would run afoul of the policy encouraging competition in the market. *See Ash*, 54 S.W.3d at 414 ("Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations.") (citing *Sturges*, 52 S.W.3d at 726). As an intermediate appellate court, we have no authority to alter the scope of an established cause of action. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 564-65 (Tex. App.—Austin 2004, no pet.) ("intermediate appellate court [must] follow the precedents of the Texas Supreme Court unless and until the high court overrules them."). Because there is no supreme court authority holding that a cause of action for tortious interference with prospective business relationships includes conduct that results only in a delay of the execution of a contract, we must affirm the trial court's dismissal of this claim.

Texas Disposal's fifth issue is overruled.

**Attempted Monopolization/Antitrust**

In its sixth issue, Texas Disposal asserts that the trial court erred by dismissing its antitrust claim for a lack of evidence. To prevail on a claim of attempted monopolization, a plaintiff must establish that the defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and had a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also* Tex. Bus. & Com. Code Ann. § 15.05(b). Here, on summary judgment, the trial court ruled that Waste Management's conduct, allegedly performed in an attempt to monopolize, did not, as a matter of law, (1) constitute predatory

41

or anticompetitive conduct or (2) create a dangerous probability of Waste Management achieving monopoly power over the San Antonio or Austin markets.[23] To demonstrate that the court's grant of summary judgment against its antitrust claim was in error, Texas Disposal must demonstrate that there is evidence in the record to raise a genuine issue of material fact on both of these essential elements; if the record is void of evidence to support any single essential element, we must affirm the dismissal. *See* Tex. R. Civ. P. 166a.

Generally, Texas Disposal claims that Waste Management engaged in anticompetitive behavior by lobbying and negotiating with government officials from Austin and San Antonio in a manner that would advance Waste Management's business and harm Texas Disposal's and that was defamatory of Texas Disposal. Next, Texas Disposal asserts that, while these alleged anticompetitive activities were taking place, Waste Management controlled over 48% of the San Antonio landfill market and 35% of the Austin landfill market, meaning that there was a high probability of success for Waste Management to obtain a monopoly of the landfill market in these cities.

---

[23] Specifically, the court ruled that, pursuant to Waste Management's traditional summary judgment grounds, it had conclusively negated these two essential elements of Texas Disposal's attempted monopolization claim and that, pursuant to its no-evidence ground, Texas Disposal had failed to produce a scintilla of evidence to support the dangerous probability element. *See* Tex. R. Civ. P. 166a(c), (i); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002) (no evidence standard); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (traditional standard). The court denied Waste Management's motion as to the "intent to monopolize" element, finding that there was evidence in support of it. Thus, Texas Disposal's challenge on appeal is limited to the other two elements—predatory or anticompetitive conduct and a dangerous probability of achieving a monopoly.

We begin our review by considering whether there is evidence in the record to demonstrate that Waste Management's efforts to prevent Texas Disposal from obtaining the San Antonio and Austin contracts created a dangerous probability of monopoly. To withstand summary judgment on the element of "dangerous probability of monopoly," a plaintiff must adduce proof that the defendant's conduct "threatens actual monopolization." *Spectrum Sports*, 506 U.S. at 456. In determining if there is an actual danger of monopoly, we must "consider the relevant product and geographic market and the defendant's economic power in that market." *Id*. at 459. Courts have required evidence clearly defining the relevant market in order for a plaintiff to prevail on this element. For example, in *Surgical Care Center v. Hospital Service District No. 1*, the plaintiff's evidence was insufficient because the expert defined the "geographic area" simply by relying on the service area without identifying what other hospitals or clinics may have been competitors within that area. 309 F.3d 836, 840 (5th Cir. 2002). Also, the time to analyze whether there is a dangerous probability of monopolization is when the acts occur, not in hindsight. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 991 (5th Cir. 1983). Just because the defendant does not ultimately achieve a monopoly does not mean there was not a dangerous probability that the defendant would succeed. *Id*.

Because the purpose of the statute is to protect the public's interest in a competitive market, the test is directed "not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports*, 506 U.S. at 458. The Supreme Court noted that it "may be difficult to distinguish robust competition from conduct with

43

long-term anticompetitive effects" but cautioned courts to "avoid constructions . . . which might chill competition, rather than foster it." *Id*. at 458-59.

Texas Disposal has failed to provide evidence concerning the relevant market and Waste Management's ability to lessen competition within that market. Although the geographic area centers on Austin and San Antonio, the record reflects that both parties also transport waste from various surrounding communities. Texas Disposal fails, however, to explain what the market availability for their services was in these areas at the time of Waste Management's actions and, much less, what other waste disposal competitors existed in the relevant market and, if there were any other competitors, what percentage of the market they controlled. A review of Texas Disposal's various summary judgment pleadings and appellate briefs reveals the same broad argument each time without any supporting evidence.

Specifically, Texas Disposal consistently asserts that Waste Management controlled 48% of the landfill market in San Antonio and 35% in Austin. But, Texas Disposal never cites or attaches any evidence that supports this claim. Moreover, even assuming it is true that Waste Management controlled approximately 40% of the market, this is not evidence of a dangerous probability of monopoly without evidence to define the market, as discussed above. Finally, the fact that Waste Management controlled less than half of the relevant market does not, standing alone, create a genuine issue of material fact about whether Waste Management had a dangerous probability of achieving monopoly power. This situation is easily contrasted with the supreme court's recent review of cases in which the defendants' control of 75%-100% of the market was considered material. *See Coca-Cola Co. v. Harmar Bottling Co*., 50 Tex. Sup. J. 21, 2006 Tex. LEXIS 1038,

44

at *48 & n.62 (Tex. Oct. 20, 2006) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *see also Surgical Care Ctr.*, 309 F.3d at 840 n.5 (noting that evidence was insufficient where defendant's control of 42%-44% share of market "was not dominant").

Based on Texas Disposal's failure to provide evidence that Waste Management's actions created a "dangerous probability of monopoly," which is an essential element of Texas Disposal's attempted monopolization claim, the trial court did not err in granting Waste Management's summary judgment on this claim. *See* Tex. Bus. & Com. Code Ann. § 15.05(b); Tex. R. Civ. P. 166.

Texas Disposal's sixth issue is overruled.


**CONCLUSION**

Regarding Texas Disposal's defamation claims arising from the Action Alert memo, we hold that the jury's finding of actual malice is supported by clear and convincing evidence and that the trial court erred in refusing to question and instruct the jury on the issues of defamation per se and presumed damages. Therefore, we overrule Waste Management's cross point and sustain Texas Disposal's first and second issues. This requires that we reverse and remand the court's take-nothing judgment for a new trial on Texas Disposal's defamation claims arising from the Action Alert memo consistent with this opinion.

Regarding Texas Disposal's claims arising from the 1998 Communications, we hold that the trial court correctly concluded that they are barred by the statute of limitations and, therefore, do not decide whether they were privileged communications. Accordingly, we overrule Texas

45

Disposal's third and fourth issues.  Regarding Texas Disposal's claims for tortious interference and attempted monopolization, we hold that the trial court correctly granted summary judgment as to both claims because Texas Disposal failed to put forth evidence of at least one essential element of each claim.  As a result, we overrule Texas Disposal's fifth and sixth issues.  Based on these rulings, the judgment is affirmed in all other respects.

 

 

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton**;**
      Justice B. A. Smith not participating

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed:   April 3, 2007