Affirmed as Modified and Opinion filed February 26, 2008








 

Affirmed as Modified and Opinion filed February 26, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00745-CV

____________

 

EXXON MOBIL CORPORATION, Appellant

 

V.

 

DWIGHT HINES AND SHANNON EVERETT, Appellees

 



 

On Appeal from the 125th
District Court

Harris County, Texas

Trial Court Cause No. 2004-35573

 



 

O P I N I O N








This is a double appeal in a lawsuit filed by
appellees/cross-appellants, Dwight Hines and Shannon Everett (collectively Aappellees@), alleging
defamation and age discrimination against their former employer,
appellant/cross-appellee, Exxon Mobil Corporation (hereinafter AExxon@).  In regards to
the discrimination claims, the trial court granted summary judgment favoring
Exxon.  After trial on the defamation claims, a jury found that Exxon defamed
appellees and awarded damages totaling $467,500.  In its appeal, Exxon contends
that (1) the allegedly defamatory statements were privileged as a matter of
law; (2) the Texas employment at-will doctrine bars appellees= claims; (3) the
employment at-will doctrine, at a minimum, prevents appellees from recovering
economic damages under the facts of this case; (4) the evidence is legally
insufficient to support the award of noneconomic damages; and in the
alternative, (5) the trial court erred in its submission of the excessive
publication issue to the jury.  In their cross-appeal, Hines and Everett
contend that the trial court erred in granting summary judgment against their
age discrimination claims.  We modify the trial court=s judgment to render judgment that appellees
take nothing on their defamation claims.  We affirm the judgment as modified.

I.  Background

On November 20, 2003, Exxon Mobil Corporation terminated
the employment of Dwight Hines and Shannon Everett.  At the time of their
terminations, Hines was 52 years old and had worked for Exxon Mobil Chemical
Company (a division of Exxon) for 23 years.  Also at that time, Everett was 50
years old and had worked for the same division for 19 years.  The reason Exxon
gave Hines and Everett for their terminations was violation of the guidelines
governing Exxon=s Educational Matching Gift Program. 
Through this program, Exxon employees and retirees who contribute to colleges
and universities may request that Exxon Amatch@ their
contributions (not to exceed $5,000) at a ratio of 3 to 1.

In 2002, Exxon undertook a periodic audit of the Matching
Gift Program.  In the course of their investigation, two internal auditors,
David Hintz and Thomas Barnes, became interested in contributions Hines and
Everett made to their alma mater Graceland University in Lamoni, Iowa.  At the
close of their investigation, the auditors concluded that Hines and Everett had
contributed to a scholarship fund at Graceland and had applied for Exxon to
match those contributions during the same period of time in which their
children were receiving scholarships from the fund.  The auditors further
surmised that Hines and Everett knowingly participated in a scheme designed to
obtain a benefit for their children in violation of Matching Gift Program
guidelines, which preclude members of the employees= families from
benefitting from the charitable contributions and matching funds.








In July 2003, the auditors presented their findings to the
supervisors of Hines and Everett and those of other employees who had been
identified through the audit as having made suspect contributions. 
Subsequently, Charlie Jones, a human resources manager, was assigned to review
the findings and recommend discipline.  In August 2003, Jones gave his
recommendations to the employees= managers.  Then,
on September 23, 2003, he presented the recommendations by way of a conference
call to the division vice presidents responsible for certain of the employees
in question.  Participating in this meeting were Jones, Bruce Macklin (vice
president for chemicals), Don Daigle (vice president for refining and supply),
Nate Jenkins (a controller in chemicals, who, according to Jones, helped the
auditors with the investigation), and Jack Clark (Jones=s supervisor in
the human resources department).[1] 
During this meeting, Jones specifically accused Hines and Everett of
participating in an Aelaborate funding scheme@ with Aintent to defraud@ the Matching Gift
Program.








Subsequently, on October 23, Jenkins gave a substantially
similar presentation to Daniel Sanders, President of Exxon Mobil Chemical
Company, who then approved Jones=s recommendation
that Hines= and Everett=s employment be
terminated.  On November 20, 2003, Hines= and Everett=s employment was
terminated.  On December 1, 2003, Exxon sent a letter addressed to all current
employees and retirees who had previously applied for matching funds for
contributions to Graceland, informing them that Graceland was no longer
eligible to receive matching funds as a result of an audit of such
contributions.  The letter further stated that A[a]buses of the
program by a few individuals and institutions jeopardize its continuation. . .
.  [D]ecisions to rescind an institution=s eligibility . .
. are made to preserve the integrity of the program.@

Hines and Everett sued Exxon alleging defamation and age
discrimination.  As will be discussed in greater detail below, Hines and
Everett asserted that various statements made by Exxon representatives were
defamatory and compensable.  They further alleged that Exxon=s stated reason
for the dismissals, i.e., violation of the Gift Matching Program
guidelines, was a mere pretext for age discrimination.

Prior to trial, Exxon filed a partial motion for summary
judgment asserting principally that appellees/cross-appellants could not
provide legally sufficient evidence that the stated reason for the terminations
was pretextual.  The trial court granted the motion against
appellees/cross-appellants= age discrimination claims.








The defamation claims proceeded to trial.  After both sides
closed, the trial court submitted a jury charge asking whether eleven
particular statements or sets of statements were defamatory towards Hines and
whether twelve particular statements or sets of statements were defamatory
towards Everett.  The jury found that four sets of statements were defamatory
against both, including statements contained in:  (1) an AIssues and
Findings@ document prepared
by the auditors; (2) Jones= September 23 presentation to the division
vice presidents, (3) the October 23 presentation to the president of Exxon
Chemical, and (4) the December 1 letter to employees and retirees who had
contributed to Graceland.  In regards to Everett, statements in an additional
document, identified in the charge only as A[t]he November 19,
2003 document,@ were also found to be defamatory.  The jury further found
that Exxon communicated the September 23 and October 23 presentation statements
to people Aother than those persons having an interest or duty in
the matter to which the statement related.@  However, the
jury concluded that Exxon did not communicate the Issues and Findings document,
the December 1 letter, or the November 19 document to anyone Aother than those
having an interest or duty in the matter.@

In answer to the damages submissions, the jury found that
Hines suffered $100,000 in past mental anguish, $100,000 in injury to character
and reputation, and $100,000 in past and future lost income and lost
unemployment benefits.  It further found that Everett suffered $75,000 in past
mental anguish, $75,000 in injury to character and reputation, and $100,000 in
past and future lost income and lost unemployment benefits.  Lastly, the jury
found that Exxon was responsible for 85% of the damages awarded, and Hines and
Everett were each responsible for 15% of their own damages.  Based on the
verdict, the trial court awarded Hines $255,000 and Everett $212,500 plus pre-
and post-judgment interest.  As stated, both sides appeal.  Exxon attacks the
defamation judgment; Hines and Everett challenge the summary judgment against
their discrimination claims.

II.  The Defamation Claims

In its appeal, Exxon contends that (1) as a matter of law,
the allegedly defamatory statements were protected under the qualified
privilege for investigations of employee wrongdoing and were not excessively
published; (2) the Texas employment at-will doctrine bars appellees= claims; (3)  the
employment at-will doctrine, at a minimum, prevents appellees from recovering
economic damages under the facts of this case; (4) the evidence is legally
insufficient to support the award of noneconomic damages; and in the
alternative, (5) the trial court erred in its submission of the excessive
publication issue to the jury.  Appellees dispute Exxon=s contentions and
further assert that even if the September 23 and October 23 presentations were
privileged as a matter of law, the defamation judgment is still supported by
Exxon=s publication of
the December 1 letter to employees and retirees.








A.  Damages Issues

We turn
first to Exxon=s challenges to the jury=s damages award.  Defamatory statements can be categorized as
either per quod or per se.  Tex. Disposal Sys. Landfill, Inc.
v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 580 (Tex. App.CAustin 2007, pet. denied). 
Statements that are defamatory per quod are actionable only upon
allegation and proof of damages; thus, before a plaintiff can recover for
defamation per quod, he or she must carry the burden of proof on both
the existence and amount of damages.  Id. (citing Time, Inc. v.
Firestone, 424 U.S. 448, 459 (1976), and Leyendecker & Assoc., Inc.
v. Wechter, 683 S.W.2d 369, 374 (Tex.1984)); see also Black=s Law Dictionary 525 (2d Pocket ed.
2001).  In cases involving defamation per se, however, damages are
presumed to flow from the nature of the defamation itself; thus, such an action
can be sustained even without specific proof of the existence and amount of
harm.  See Tex. Disposal, 219 S.W.3d at 580-81 (citing Bentley v.
Bunton, 94 S.W.3d 561, 605 (Tex. 2002), and Knox v. Taylor, 992
S.W.2d 40, 50 (Tex. App.CHouston [14th Dist.] 1999, no pet.)); see also Black=s Law Dictionary 525.

Here,
the trial court clearly charged the jury on defamation per quod.  The
damages instructions and questions in the charge make no mention of damages
being presumed, but instead asked the jury to determine the amount of
damages Aif any.@  Appellees did not argue in the
trial court and do not argue on appeal that their claims were defamation per
se as opposed to per quod.  Consequently, appellees had the burden
of proving both the existence and amount of damages in order to maintain their
defamation causes of action.








Actual damages in defamation actions fall into two
categories: (1) those damages termed Aeconomic,@ Aspecial,@ or Aout-of-pocket,@ such as, in this
case, lost income and lost employment benefits; and (2) those termed Anoneconomic@ or Ageneral,@ such as, in this
case, mental anguish and injury to character or reputation.  See Tex.
Civ. Prac. & Rem. Code ' 41.001(4) (defining Aeconomic damages@), ' 41.001(12)
(defining Anoneconomic damages@); Gertz v.
Robert Welch, Inc., 418 U.S. 323, 349 (1974) (explaining that defamation
damages are not confined to Aout-of-pocket loss@); Morrill v.
Cisek, 226 S.W.3d 545, 550-51 & n. 3-4 (Tex. App.CHouston [1st
Dist.] 2006, pet. denied) (discussing Aspecial@ and Ageneral@ defamation
damages).  In its third and fourth issues, Exxon contends that (1) the economic
damages awarded by the jury are barred by application of the employment at-will
doctrine, and (2) the award of noneconomic damages is not supported by legally
sufficient evidence in the record.  Both contentions are essentially legal
sufficiency or as-a-matter-of-law issues.

We must sustain a legal sufficiency challenge if the record
demonstrates that:  (1) there is a complete absence of evidence on a vital
fact; (2) rules of law or evidence prevent the court from giving weight to the
only evidence offered to prove a vital fact; (3) the evidence offered to prove
a vital fact is no more than a scintilla; or (4) the evidence establishes
conclusively the opposite of the vital fact.  City of Keller v. Wilson,
168 S.W.3d 802, 810 (Tex. 2005).  We consider the evidence in the light most
favorable to the verdict and indulge every reasonable inference that supports
it.  Id. at 822.  The evidence is legally sufficient if it would enable
reasonable and fair‑minded people to reach the verdict under review.  Id.
at 827.  We credit favorable evidence if reasonable jurors could, and disregard
contrary evidence unless reasonable jurors could not.  See id.

As discussed above, the jury awarded both economic and
noneconomic damages to each of the appellees based on publication of the
September 23 and October 23 presentations.  Consequently, we consider in turn
whether the evidence was legally sufficient to support the finding of economic
and non-economic damages as related to publication of these two presentations.[2]

 








1.  Economic Damages and the At-Will Employment Doctrine

In its third issue, Exxon contends that the economic
damages awarded for lost income and lost employment benefits are barred by
application of the employment-at-will doctrine.  In response, appellees argue
that:  (1) the doctrine does not in fact bar defamation damages just because
the defamatory statements resulted in termination, and (2) the jury must have
considered how much of the economic damages were due to the termination versus
how much were due to the defamation because the jury awarded less in economic
damages than appellees= experts testified to at trial.  The
arguments under this issue therefore break down into two groups: (1) those
involving the legal question of whether the at-will doctrine bars the defamation
recovery, and (2) those involving the factual question of whether there is any
evidence of defamation damages separate and apart from the damages for
termination.

a.  Application of the At-Will Employment Doctrine








Under the at-will employment doctrine, an employer may
generally terminate an at-will employee without fear of legal repercussions for
a good reason, a bad reason, or no reason at all.  County of Dallas v.
Wiland, 216 S.W.3d 344, 347 (Tex. 2007); Montgomery County Hosp. Dist.
v. Brown, 965 S.W.2d 501, 502 (Tex. 1998).[3] 
Additionally, as a corollary to the doctrine, Texas does not recognize a cause
of action for Anegligent investigation@ in the employment
context.  See Tex. Farm Bureau Mut. Ins. Co. v. Sears, 84 S.W.3d 604,
606 (Tex. 2002).  Based on these two principles, Exxon argues that appellee=s economic damages
are barred because they resulted from the employment terminations and not
directly from the defamation.  Appellees argue that, like design defect and
breach of warranty in the products liability context, wrongful termination and
defamation in this case are simply alternative causes of action that would
result in the same or similar awards of damages.[4] 
Thus, according to appellees, they may recover fully on the viable claims for
defamation, irrespective of any overlap in damages with nonactionable claims
for wrongful termination.

We begin by noting that appellees do not allege, and there
is no evidence to suggest, that Exxon ever communicated the substance of the
September 23 and October 23 presentations to anyone outside the company.[5] 
Consequently, under appellees= theory, the internal communication of the
reason for the terminations (i.e., the alleged defamation) enables them
to recover the damages caused by the terminations.  This would clearly violate the at-will
employment doctrineCand its general prohibition against
wrongful termination claims by at-will employeesCby creating
liability where at law none may exist (i.e., by allowing monetary
recovery when the employer terminates the employee for a Abad reason@).[6] 
See, e.g., Wiland, 216 S.W.3d at 347; Brown, 965 S.W.2d at 502. 
We reject appellees= argument and hold that a terminated
employee may not recover damages resulting from employment termination simply
because the reason for the termination (even if defamatory) may have been
internally communicated within the employing company.








Our holding should not be construed as suggesting that an
employer can never defame an employee in Texas or that an employee can never
recover defamation damages from his or her employer (whether the defamation was
communicated only internally or also externally); it merely means that an
employee cannot recover as defamation damages those damages caused by
employment termination.  Accordingly, to the extent damages resulting
from termination were awarded in the judgment, such award is prohibited
under Texas law.  However, if appellees proved defamation damages other than
those caused by their terminations, they may be entitled to recover those sums.

b.  Sufficiency of the Evidence Regarding Distinct Defamation Damages

Appellees additionally insist that the record contains
evidence of economic damages caused by the defamatory statements separate and
apart from the damages resulting from the terminations.  Rather than citing to
any such evidence, however, appellees point to the fact that the jury awarded a
lesser amount for economic damages than appellees= experts described
at trial.  Appellees= theory is that because the jury awarded
less than was described, it must have considered how much of the economic
damages were due to the terminations versus how much were due to other factors
and awarded only the latter amount.

To begin with, a jury might decide for a variety of
legitimate reasons to discount the damages actually awarded relative to the
damages testified to by an expert.  See generally McGalliard v. Kuhlmann,
722 S.W.2d 694, 697 (Tex. 1986); Prati v. New Prime, Inc., 949 S.W.2d
552, 555 (Tex. App.CAmarillo 1997, pet denied).  That the jury
did so in this case (and speculation about why it might have done so) does not
constitute evidence that there were additional economic damages separate and
apart from the termination damages.  More importantly, appellees cite to no
evidence introduced at trialCand our review has revealed no evidence in
the recordCof economic damages caused by other than appellees= terminations.








In support of their economic damages claims, appellees
offered the reports and testimony of two experts:  Haran Levy, a certified
public accountant who testified and reported regarding the value of lost
earnings and benefits, and Robert Cirkiel, an actuary who testified and
reported regarding the value of the Exxon pension and medicare supplement
plans.  Levy specifically testified that his report covered Alost earnings and
certain benefits . . . due to the November 23 termination.@  He did not
identify any damages as being caused by anything other than termination.[7] 
Cirkiel, as stated, testified and reported regarding the pension and medicare
supplement plans appellees lost when they were terminated.  He did not identify
any damages that were not caused by the terminations in either his report or
his testimony.  Appellees point to no other evidence of economic damages in the
record, and we are not aware of any additional evidence.  Consequently, the
evidence is legally insufficient to sustain the award of economic damages for
excessive publication of the September 23 and October 23 presentations.

2.  Legal Sufficiency of the Evidence to Support Noneconomic Damages

In its fourth issue, Exxon contends that the evidence is
legally insufficient to sustain the jury=s award of
noneconomic damages, namely those for mental anguish and injury to character or
reputation.  Exxon specifically argues that there is only minimal evidence that
the noneconomic damages resulted from anything other than the terminations, and
no evidence that these damages resulted from statements in the September 23 or
October 23 presentations (which appellees apparently were not even aware of
until the lawsuit was filed).  Appellees maintain that their non-economic
damages resulted more from the reasons given for the terminations and the
refusal to retract those allegations than from the actual terminations.








Even if appellees= assertion is
correct regarding the source of their damages, under the charge as given and as
answered by the jury, to be sustainable, the damages must have been caused by
statements in the September 23 and October 23 presentations and not simply by
the general reasons given for the terminations.[8] 
As discussed above, in cases involving defamation per quod, damages are
not presumed to have flowed from the very fact of communication but must be
proven to have resulted from the defamatory communication.  See, e.g., Tex. Disposal, 219 S.W.3d at 580.  Also as
discussed above, appellees cannot recover for damages to the extent such
damages were caused by their terminations.

Specifically, in order to sustain a jury award of mental
anguish damages in the defamation context, there must be not only evidence of
compensable mental anguish but also some evidence justifying the amount
awarded.  Bentley v. Bunton, 94 S.W.3d 561, 606 (Tex. 2002) (citing Saenz
v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex.
1996)).  Such evidence must show a high degree of mental pain and distress that
is more than mere worry, anxiety, vexation, embarrassment, or anger; it further
must directly demonstrate the nature, duration, and severity of the mental
anguish, which caused a substantial disruption in the claimant=s daily routine.  EMC
Mortgage Corp. v. Jones, No. 05-06-00419-CV, 2007 WL 2447122, at *10 (Tex.
App.CDallas 2007, no
pet.) (citing Saenz, 925 S.W.2d at 614, and Latham v. Castillo,
972 S.W.2d 66, 70 (Tex.1998)).  Similarly, to sustain an award of injury to
reputation or character, there must be competent evidence of Aactual injury@ to the interests
involved (assuming malice is not an issue in the case).  See Gertz, 418
U.S. at 349-50; Restatement (Second) of Torts ' 621, cmt. b; see
also Bentley, 94 S.W.3d at 619-20 (Baker, J., dissenting) (discussing Gertz);
Finklea v. Jacksonville Daily Progress, 742 S.W.2d 512, 516 (Tex. App.CTyler 1987, writ
dism=d w.o.j.) (same).








Here, the evidence regarding appellees= general, or
noneconomic, damages was presented in two basic forms: (1) specific testimony
that certain actions or statements caused certain damage (negative emotions,
harm to reputation, etc.), and (2) general testimony that each of the appellees
felt negative emotions after his termination or felt as if his reputation and
character had been sullied by the reasons for the termination.  Regarding the
first category, appellees cite to no specific testimony wherein a witness
stated that either of the appellees was damaged (noneconomically) specifically
by statements contained in the two presentations.  To the contrary, the
specific testimony related to such things as the fact of being terminated,
having to move, receipt of the December 1 letter, the reasons given to each of
the appellees for being terminated, and telling family, friends, and others why
they were terminated.[9] 
None of this evidence (however negative and justified the resulting emotions
and beliefs may have been) reveals a causal connection to the presentations in
question.  The fact that the evidence identifies other, distinct causes of the
harm, prevents this evidence from supporting the conclusion that appellees were
noneconomically harmed by publication of the two presentations.








Regarding the second category, the general testimony of
negative emotions and character disparagement was also insufficient for several
interconnected reasons.[10] 
First, most importantly and obviously, none of the general testimony was tied
specifically to statements in the two presentations; thus, it does not prove
that any damage was caused by publication of those statements.  Second,
although it might be reasonable to assume when specific evidence of damages is
intermixed with more general evidence of damages that all of the evidence
relates to damage caused by the same source, it is not reasonable to infer that
the general testimony in such a situation (as appellees suggest here) relates
to a different, unmentioned specific cause.  In other words, the mere fact that
the general testimony was generalized does not imply that it related to a
separate cause from the cause-specific testimony.  Third, there is no evidence
that appellees even knew about the two presentations during the time frame in
which the alleged damages occurred; thus, there can be no inferential causal
link.[11] 
Lastly, when viewed in isolation from the specific testimony, the general
testimony does not constitute the type of detailed evidence required to support
awards of mental anguish or reputation damages in the defamation context.  See
Gertz, 418 U.S. at 349-50; EMC Mortgage Corp., 2007 WL 2447122, at
*10.  Based on the foregoing, we find that the evidence is legally insufficient
to sustain the award of noneconomic damages for publication of statements in
the September 23 and October 23 presentations.

C.  The December 1 Letter








Appellees additionally assert that the trial court=s final judgment
may rest on Exxon=s publication of the December 1 letter to
employees and retirees, even if the court finds that the judgment cannot be
supported by reliance on the September 23 and October 23 presentations.  As
mentioned above, the jury found that the December 1 letter was defamatory
against both men but that it was not excessively published.  Appellees assert
that the letter was excessively published as a matter of law; thus, the jury=s finding to the
contrary should be disregarded.

The primary difficulty with appellees= position is that
even if the letter in question was excessively published as a matter of law, no
damages were awarded on this basis.  The damages questions in the charge were
predicated on positive answers to both the defamation question and the
excessive publication question for each particular statement.  Since the jury
found that the December 1 letter was not excessively published, it clearly did
not consider that letter in assessing damages.  Appellees moved for judgment on
the verdict.  The trial court=s judgment tracks the jury=s damages
findings.  Consequently, even if appellees are correct that the letter was
excessively published as a matter of law, the judgment did not award any
damages based thereon.  Because appellees do not raise a cross-point on appeal
complaining about the lack of a damages finding, we cannot reverse a judgment
on what would be unassigned error.  See Pat Baker Co. v. Wilson, 971
S.W.2d 447, 450 (Tex. 1998); Chapman v. Olbrich, 217 S.W.3d 482, 501
(Tex. App.CHouston [14th Dist.] 2006, no pet.).

In summary, all of the amounts awarded as defamation
damages by the jury are either barred by application of law or unsupported by
more than a scintilla of evidence in the record.  Accordingly, we sustain Exxon=s third and fourth
issues.[12]

III.  The Discrimination Claims

In their pleadings, appellees additionally alleged that
Exxon unlawfully terminated their employment on the basis of age.  Prior to
trial, Exxon filed a motion for summary judgment against these causes of
action; the trial court granted the motion and entered a partial summary
judgment.  In their cross-appeal, appellees challenge the trial court=s ruling.  The key
dispute between the parties is whether appellees presented legally sufficient
evidence of pretext in response to the motion for summary judgment.








A.  Shifting Evidentiary Burdens in the Employment Discrimination
Context

The Texas Commission on Human Rights Act (TCHRA) prohibits
discrimination against an employee on the basis of age, among other personal
characteristics.  Tex. Lab. Code Ann.
'' 21.051-.556.  The
TCHRA is modeled on the Federal Civil Rights Act of 1991 (Title VII); thus,
Texas courts follow federal statutes and cases in applying the statute.  Quantum
Chem. Corp. v. Toennies, 47 S.W.3d 473, 476 (Tex. 2001); Winters v.
Chubb & Son, Inc., 132 S.W.3d 568, 574 (Tex. App.CHouston [14th
Dist.] 2004, no pet.).

Consequently, in analyzing discrimination cases under
TCHRA, Texas courts apply the burden-shifting scheme first enunciated in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Winters, 132
S.W.3d at 574; see also Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 142-43 (2000) (discussing development of burden-shifting scheme). 
Pursuant to this scheme, the plaintiff is first required to present a prima
facie case of discrimination.  Reeves, 530 U.S. at 142; Winters,
132 S.W.3d at 574.  Once the plaintiff has successfully demonstrated a prima
facie case, the burden shifts to the defendant to produce evidence showing a
legitimate, nondiscriminatory reason for the adverse employment action.  Reeves,
530 U.S. at 142; Winters, 132 S.W.3d at 574.  If the defendant carries
this burden, the plaintiff must then prove, by a preponderance of the evidence,
that the defendant=s stated reason is merely a pretext for
discrimination.  Winters, 132 S.W.3d at 574.  In other words, although Aintermediate
evidentiary burdens shift back and forth under this framework, >[t]he ultimate
burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the plaintiff.=@  Reeves,
530 U.S. at 142 (quoting Tex. Dept. Of Cmty. Affairs v. Burdine, 450
U.S. 248, 253 (1981)).

B.  The Summary Judgment Proceedings and Proof








The parties do not dispute that appellees presented a prima
facie case of age discrimination by demonstrating that:  both of them were over
40 when they suffered an adverse employment action, and they were either
replaced by a younger worker or a younger employee received different
treatment.  See Winters, 132 S.W.3d at 574.  The parties also agree that
Exxon presented a legitimate nondiscriminatory reason for the terminations,
namely that Hines and Everett had knowingly violated the guidelines of the
Matching Gift Program.  In its summary judgment, Exxon attacked appellees= evidence on the
third rung of the burden-shifting scheme, asserting that Hines and Everett
could provide no evidence that Exxon=s proffered
legitimate, nondiscriminatory reason for the terminations was a mere pretext
for age discrimination.

Under the Supreme Court=s opinion in Reeves,
a plaintiff demonstrates pretext by producing evidence that (1) the reason
given by the employer was not its true reason for the employment action but
rather a pretext for discrimination or (2) the reason given was unworthy of
credence.  530 U.S. at 143; Russo v. Smith Int=l, Inc., 93 S.W.3d 428,
438 (Tex. App.CHouston [14th Dist.] 2002, pet. denied).  In the
summary judgment context, a plaintiff does not have to prove pretext but must
merely establish that a genuine issue of material fact exists to avoid
judgment.  Russo, 93 S.W.3d at 438 (citing Amburgey v. Corhart
Refractories Corp., 936 F.2d 805, 813 (5th Cir. 1991)).  Summary judgment
will be improper if the plaintiff makes a prima facie case and produces
sufficient evidence for a jury to disbelieve the employer=s stated reason
for discharge.  See Reeves, 530 U.S. at 146‑48.  On the other
hand, an employer is entitled to summary judgment if the plaintiff=s proof creates
only a weak issue of fact as to whether the employer=s reason was
untrue, and there was abundant and uncontroverted independent evidence that no
discrimination had occurred.  See id. at 148; Winters, 132 S.W.3d
at 576; Russo, 93 S.W.3d at 439.








In their brief, appellees point to certain summary judgment
proof as constituting evidence that Exxon=s proffered
legitimate, nondiscriminatory reason for the terminations was a mere pretext
for age discrimination.[13] 
Although appellees list the proof separately, it is classifiable into four
distinct groups:

(1) evidence that appellees were not told that they
were under investigation for having violated Matching Gift Program guidelines
prior to their being terminated, including statements by appellees to this
effect;

(2) evidence that appellees were not accused of
doing anything improper other than the violations of the Matching Gift Program
guidelines, including the testimony of one of the auditors and of appellees= supervisors;

(3) evidence that what appellees were accused of
doing was common practice at Exxon, i.e., for employees to apply for
matching funds when they contributed to a university in the same year that a
child of the employee received a scholarship to attend the university,
including the testimony of both auditors; and

(4) evidence that
personnel higher in the Exxon hierarchy did little if anything to further
investigate the allegations against appellees before deciding to terminate
them, including the testimony of Jones (the human resources manager assigned to
recommend discipline) and of Sanders (the chemical division president), as well
as testimony concerning the corporate audit group and division vice presidents.








Regarding the first category of proofCevidence that
appellees were not told they were under investigationCappellees offer no
explanation as to how this demonstrates that the investigation was somehow a
pretext for discrimination.[14] 
Furthermore, there was summary judgment proof that the auditors interviewed
both appellees regarding the audit of the Matching Gift Program; thus, they had
some knowledge of the on-going audit.  Indeed, in his deposition, excerpts of
which appear in the summary judgment record, Sanders testified that appellees
received Apretty solid warning@ that they were
being accused of wrongdoing because they had (1) signed certain audit-related
forms, (2) been interviewed by the auditors, and (3) had attended briefings on
codes and standards of business conduct and had previously participated in
business practice reviews.  Accordingly, under the facts of this case, the
failure to inform appellees of specific accusations and give them a chance to
rebut the specific accusations is only very weak evidence of pretext.

Concerning the second categoryCthe absence of
other wrongdoingCappellees again do not explain how this
evidence demonstrates pretext.  Exxon has not asserted that appellees were
terminated for general wrongdoing; Exxon asserted and asserts that they were
terminated for particular violations of the Matching Gift Program guidelines. 
Therefore, the presence or absence of evidence regarding other wrongdoing is
irrelevant.

As to the third categoryCthat appellees
were engaged in a common practice within ExxonCthe proof that
appellees cite does not lend as much support to their argument as they
contend.  While one of the auditors, Barnes, acknowledged that it was Aa very common
practice@ for employees to
apply for matching funds for contributions to a university in the same year
that a child of that employee received a scholarship to attend the university,
appellees were accused of doing substantially more.  Specifically, appellees
were accused of knowingly participating in a scheme that resulted in their
family members= directly benefitting from the Exxon matching
funds.  Appellees point to no evidence that participation in such a funding
scheme was a common practice for Exxon employees or other charitable
institutions.








Lastly, regarding the fourth categoryCevidence that
higher-ups did little to further investigate the allegationsCappellees again
fail to explain how this alleged failure demonstrates pretext.  There was
significant evidence in the record showing that the auditors= findings were
considered by various levels of supervisors.  Presentations were given,
received, and reviewed.  Interaction between the auditors and the supervisors
occurred at various stages.  Appellees offer no specific argument or evidence
regarding why the supervisors should have felt compelled to conduct their own
independent investigations.  That the supervisors were apparently comfortable
with the work done by the auditors is, at best, very weak evidence of pretext.

In summary, appellees= summary judgment
arguments and evidence provided, at best, very weak evidence that Exxon=s proffered
legitimate, nondiscriminatory reason for the terminations was merely a pretext
for age discrimination.  See Reeves, 530 U.S. at 148; Winters,
132 S.W.3d at 576; Russo, 93 S.W.3d at 439.  Accordingly, we overrule
appellees= sole issue on cross appeal.

III.  Conclusion

In conclusion, we hold that the trial court erred in
awarding judgment for appellees on their defamation causes of action but
properly granted summary judgment against appellees on their age discrimination
claims.  Accordingly, we modify the trial court=s judgment to render judgment that appellees
take nothing on their defamation claims.  We affirm the judgment as modified.

 

/s/      Adele Hedges

Chief Justice

 

Judgment rendered and Opinion filed
February 26, 2008.

Panel consists of Chief Justice Hedges,
Justice Seymore, and Former Justice Price.*









[1]  Appellees assert that neither Daigle, Jenkins, nor
Clark had any responsibility regarding the investigation of appellees or their
eventual discipline.  While appellees make a valid point regarding Daigle,
their assertions regarding Jenkins and Clark are supported by misleading
quotations from Jones=s trial testimony.  This includes quotation of a
question asked by appellees= trial counsel
as opposed to Jones=s actual testimony, which was to some degree at odds
with the question.  As noted above, Jones testified that Jenkins aided the
audit department with their investigation; Jones further testified that Jenkins
made a subsequent presentation on the matter to Daniel Sanders, President of
Exxon Mobil Chemical Company.  Regarding Clark, Jones testified that as his
boss, Clark Ahad to agree to my recommendation@ and Awould take
responsibility for that.@  Jones further defended Daigle=s participation in the meeting on the grounds of
promoting consistency and fairness in discipline across the corporation.

Appellees additionally assert that the
PowerPoint presentation prepared for the September 23 teleconference was
subsequently sent by email to at least five additional people within the
company.  Plaintiff=s Exhibit 93 contains two emails, one by Jones and one
by Clark, transmitting an attached document entitled AEducational Matching Gift Case@ to participants in the September 23 meeting as well as
five other recipients within Exxon.  Again, Jones defended the participation of
others within Exxon on the grounds of promoting consistency and fairness in
discipline across the corporation.





[2]  We note at the outset that in the charge, the court
authorized the jury to award damages Aif
any, that resulted from such statements.@ 
Thus, the court did not limit damages to those caused by excessive
publication of the statements.  While Texas law has surprisingly little to
offer on this topic, the court=s charge
clearly runs counter to the Restatement in this regard.  See Restatement (Second) of Torts ' 599, cmt. b (AThe effect of abuse of a
conditional privilege is to make the publisher of the defamation subject to
liability for the abuse.  If the harm done by the abuse is severable, and can
be distinguished from the harm done by a part of the publisher=s conduct that would properly be
privileged, he is subject to liability only for the excess of harm resulting
from his abuse.@).  Nevertheless, neither party raises any issues related to this aspect
of the charge.





[3]  Exceptions to the general rule include terminations
based on unlawful discrimination and retaliatory terminations violative of the
Texas Whistleblower Act.  Tex,.Gov=t
Code '' 554.001‑.010 (Texas Whistblower Act); Tex. Lab. Code '' 21.051-.556 (Texas Commission on
Human Rights Act).





[4]  Based on their defamation finding, the jury awarded
economic damages to appellees for lost income and lost employment benefits
suffered in the past and likely to be sustained in the future.  As will be
discussed in the next section of the opinion, there is no evidence in the
record to suggest that these damages were caused by any Exxon conduct other
than the termination of appellees.





[5]  Furthermore, there is no evidence that any Exxon
employee who heard or saw the September 23 or October 23 presentations
published the substance of the presentations outside the company.





[6]  Thus, the situation before us is distinctly
different from cases wherein a plaintiff alleges two alternative but not
legally prohibited causes of action such as design defect and breach of warranty in the
products liability context.  In that
situation, a plaintiff can recover under one cause of action (assuming he or
she can muster the requisite proof) without violating a prohibition against the
other claim.  Here, recovery of lost wages and employment benefits due to
termination violates the at-will employment doctrine.





[7]  Levy testified that he calculated lost earnings and
benefits only for Hines because he determined that Everett suffered Ano economic damages@ of
the types he was asked to calculate.





[8]  Interestingly, the jury found that the termination
letters given to appellees were not defamatory.  It should also be noted that
any reasons for the terminations told directly to appellees (although they
certainly may have caused mental anguish) were not necessarily defamatory, as
defamation requires publication to a third party.  See Granada Biosciences,
Inc. v. Forbes, Inc., 49 S.W.3d 610, 618 (Tex. App.CHouston [14th Dist.] 2001), rev=d on other grounds, 124 S.W.3d 167 (Tex. 2003).





[9]  For example, Hines testified that being fired was Adevastating@
and life changing, and that looking for work and starting over was Ahorrible.@ 
He further said that telling his children that he had been terminated was Ajust awful . . . just horrible,@ that he found it hard to leave Houston, and that when
he saw the December 1 letter (sent by Exxon to current and former employees who
contributed to Graceland), it was like Abeing
called a liar and cheat all over again.@ 
Debra Hines testified that she could tell from her husband=s voice that he was devastated at being terminated and
he was stunned that Exxon would not have talked to him and investigated the
facts.  She also said it was hard for him to tell the children.

Everett testified that he was in a state
of disbelief and shock when he learned of his termination and that he could not
sleep that night.  He said that receiving the December 1 letter was Aextremely upsetting.@  Rosemary Everett testified that her husband was devastated when he
lost his job for what he felt was unfair reasons and that it was a hardship to
move.  Additionally, Peter Knorr, Everett=s
immediate supervisor at Exxon, testified that when he told Everett about the
termination, A[t]here was some emotional outburst . . . . He seemed
more angry than shaken.@  There was also testimony from several witnesses that
recipients of the December 1 letter would have known that it referenced
appellees.





[10]  Examples of the more general evidence in the record
includes:  Hines= testimony that he felt his good name was still
tainted and the fact that Exxon had not retracted anything meant he was still
being called a cheater; Debra Hines testimony regarding the importance to her
husband of having a Agood name,@
that the allegations almost led to depression, and that he was affected by the
knowledge that he could not clear his name; Everett=s testimony that he had been proud to work for Exxon;
and Rosemary Everett=s testimony that her husband=s Agood name was
smeared@ and that the time after he was terminated was
emotionally and financially stressful.





[11]  As discussed in the background section above, the
presentations in question were given to small groups comprised mostly of upper
management personnel.  Although the evidence suggests the possibility that the
Powerpoint file used during the September 23 presentation was subsequently
transmitted to five other Exxon employees via email, there is no evidence that
either appellee learned of the occurrence or the substance of either
presentation.

Appellees additionally speculate that the
presentations may have been even more widely distributed based on the fact that
in his testimony, Charlie Jones refused to completely rule out the possibility
that some of the people to whom he distributed the presentations may have then
distributed the presentations to others.  However, the absence of evidence that
such redistribution did not occur does not constitute evidence that it did
occur.  Furthermore, Jones and others testified that the documents were handled
pursuant to Exxon protocol intended to limit distribution of sensitive
materials.





[12]  Because our holdings on issues three and four are
dispositive of Exxon=s appeal in its favor, we need not address Exxon=s remaining three issues.





[13]  In their brief, appellees make no specific arguments
regarding the level of proof offered by Exxon that no discrimination had
occurred.  See
Reeves, 530 U.S.
at 148; Winters, 132 S.W.3d at 576; Russo, 93 S.W.3d at 439.





[14]  In support of their assertion, appellees cite Laxton
v. Gap Inc., 333 F.3d 572 (5th Circ. 2003), in which, the appellees assert,
the Fifth Circuit held:  Athe fact that the employer never gave the plaintiff a
chance to explain her conduct or improve was sufficient to demonstrate pretext.@  We do not read the opinion so narrowly.  In
reversing a summary judgment favoring the employer in a sex discrimination
case, the Fifth Circuit pointed out that the reasons provided for the
termination included demonstrably false allegations in addition to allegations
of conduct that was Aarguably authorized@ by
the company.  The court further noted that the strength of the employee=s prima facie case of sex discrimination (which
included evidence of her capabilities for the job as well as evidence of her
supervisor=s displeasure at her pregnancy) supported the case for
pretext, concluding that all of these factors together were sufficient to raise
a fact issue.  Additionally, Laxton is distinguishable from the present
case because in Laxton, the reasons for termination were primarily that
she had made poor management decisions (something that could be improved upon);
whereas here, Exxon alleged that appellees knowingly violated company policies
and thereby received a personal benefit.  The very nature of the allegations
are completely different (alleged performance failures versus allegedly
scheming against the company=s interests).





*  Former Justice Frank C. Price sitting by assignment.